THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL NANCE, Defendant-Appellant.

Fourth District    No. 16971

Opinion filed October 15, 1981.

Daniel D. Yuhas and James G. Woodward, both of State Appellate Defender's Office, of Springfield, for appellant.

Basil G. Greanias, State's Attorney, of Decatur (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:
Armed robbery.
Jury trial.
Guilty.
Extended term—45 years.
We affirm.
The facts are somewhat prolix.
At Nance's jury trial, John Fiorino testified that as he rode his motorcycle down a Decatur street on August 5, 1980, a man on a bicycle

stopped him. Two men seated across the street and about 25 to 30 feet away then called Fiorino over to them. As he pulled into a vacant parking lot, they walked up behind him and one—whom Fiorino identified as defendant—put a handgun to the back of his head and demanded money and cocaine. Fiorino stated that he had neither. However, defendant removed Fiorino's wristwatch and either defendant or his companion took Fiorino's wallet.

In a photo identification, Fiorino was unable to state with certainty that defendant was his assailant. However, in a lineup two days after the armed robbery, he identified defendant as the gunman and Julius Pettis as the man on the bicycle.

Julius Pettis was originally charged with armed robbery in connection with this incident but was later given immunity in exchange for his testimony against defendant. Pettis testified that he came up to Fiorino and complimented him on his motorcycle, whereupon Fiorino asked whether Pettis knew anyone who wanted to buy some cocaine. After going to speak to his brother Dave and defendant, Pettis rode his bicycle back to Fiorino and told him to go across the street to where Dave and defendant were. Pettis testified that he saw defendant put a handgun near Fiorino's ear and saw defendant go through Fiorino's saddlebags after Fiorino had run away.

On cross-examination, Pettis admitted lying repeatedly to investigating officers concerning this incident. He acknowledged that, contrary to his trial testimony, he had told the officers that he had seen defendant and Fiorino together earlier in the evening, that he was some distance down the street when the armed robbery occurred, and that Dave Pettis was the gunman. He testified that he had lied "quite a lot" to a detective.

Defendant's attorney, Gary Geisler, then showed Pettis defendant's exhibit No. 2, which Pettis admitted having signed. However, he denied that the document had ever been read to him. Pettis was then shown defendant's exhibit No. 1, which he also admitted signing. However, Pettis stated that Geisler had read exhibit No. 1 to him before he signed it. (Exhibit No. 1 was simply a typewritten version of exhibit No. 2, which Geisler had written in longhand at the time he interviewed Pettis on November 5, 1980, in the Macon County jail.)

After Pettis became openly hostile to Geisler, proceedings were held outside the presence of the jury. The trial court learned that at the time Geisler interviewed Pettis in connection with this case, Pettis was incarcerated on charges arising out of the same incident and was represented by appointed counsel. Pettis was not granted immunity from prosecution until November 10, 1980, five days after the interview; he signed exhibit No. 1 on November 14. Exhibit No. 1, which Geisler himself prepared, consists of a series of questions and answers in which Pettis, *inter alia*,

stated (1) that he could see only the tops of the heads of Fiorino's assailants and was not certain they were defendant and Dave Pettis, and (2) that he did not see either of them with a gun.

It was obviously Geisler's intention to impeach Pettis with exhibit No. 1 as a prior inconsistent statement. Ruling on the State's objection to the attempted impeachment, the trial court said:

> "Number one, the question is improper as an attempted impeachment without any foundation whatsoever. To impeach a witness you have to lay foundation as to time and place, who was present, say the least. Number two I sustained it because if he should answer no, then it would be necessary for you to testify to complete the impeachment, and that, of course, I was trying to avoid because when you become a witness you no longer are competent as counsel. You can't have a dual role. You'd have to withdraw."

Before allowing Geisler to proceed with an offer of proof, the court said:

> "But I'm not going to say that counsel for one co-defendant can interview another co-defendant in the county jail, prepare a document, have him sign it and then impeach him with it as to what he signed. That's the position the Court is taking, that is not correct procedure and nor is it ethical."

During the offer of proof, Pettis stated that he had read through a copy of exhibit No. 1 and that Geisler had also read it to him prior to his signing it. Pettis testified as follows concerning the time when the original interview took place:

> "Q. Did we discuss this occurrence you had observed on August 5?
>
> * * *
>
> A. We discussed it but, you know like he told me, you know he said that, you know I won't get no perjury or nothing, he just said give him a statement. So I gave him a statement.
>
> Q. Did I ask you these questions and did you give me these answers?
>
> A. Yes, you asked me—.
>
> Q. Did I promise you that you would never get charged with perjury in this case?
>
> A. Yes, you said that I wouldn't be charged with no perjury and yes, then I gave you the statement.
>
> Q. Are you saying that this statement is all lies?
>
> A. Yes."

The trial court denied the offer of proof and sustained the State's objection to the attempted impeachment.

Gordon Bell (a Decatur police detective) recounted a statement defendant had made to him: defendant said that while he and Dave Pettis

were in the area of Church and Cerro Gordo Streets, Julius Pettis came by and told them that he knew someone who wanted to sell some cocaine. Dave told Julius to bring that person, and in a few minutes Julius and Fiorino returned. After Fiorino pulled into the parking lot, Julius and Dave told him to shut off the motorcycle's lights. Julius took the motorcycle keys, and Dave held a gun to Fiorino's head and told him they wanted cocaine. Julius searched Fiorino's pockets and saddlebags, but Fiorino then said the cocaine was in his left sock and Julius took it.

The only witness for the defense was Reginold Penermon, who testified that when he saw Fiorino the night of August 5, Fiorino said he was going to get some cocaine. Later, he saw Fiorino on his motorcycle in a vacant parking lot in the area of Church and Cerro Gordo Streets. Dave and Julius Pettis were standing beside him, and Dave was holding a gun. Defendant was in the street next to the parking lot, not in the lot or next to Fiorino's motorcycle. Penermon saw Fiorino run away and looked again to see the Pettises also fleeing and defendant walking away.

On cross-examination, Penermon testified that he is also known as "Barbara," that he had been convicted of theft, and that, at the time of trial, he had been defendant's cellmate a little over a month. He stated that defendant is larger than he is and that he and defendant would continue to occupy the same cell after the trial. The following colloquy then occurred:

> "Q. Isn't it true that if you don't testify, that if you testify implicating Michael Nance in this crime that you've got hell to pay when you go back to that cell?
>
> A. No.
>
> MR. GEISLER: Objection, Your Honor.
>
> THE COURT: He may answer.
>
> A. No, I don't think so."

The jury found defendant guilty of armed robbery. At his sentencing hearing, the State showed that on March 1, 1978, defendant had pled guilty to armed robbery. Based on that factor, the trial court sentenced him to an extended term of 45 years.

## I

■■ ■ Defendant's principal contention on appeal is that the trial court should have allowed defense counsel to impeach Julius Pettis with the prior inconsistent statement he had given to Geisler. As the trial court observed, a witness can be impeached with a prior inconsistent statement only if the attorney seeking to impeach him first directs his attention to the time, place, and persons present when the statement was made and is advised as to the substance of the statement. (*People v. Smith* (1980), 78 Ill. 2d 298, 399 N.E.2d 1289.) The State argues that defense counsel failed

to lay such a foundation because he did not specify the particular occasion on which the interview occurred.

The purpose of the foundation requirement for admission of a prior inconsistent statement is to give a witness an opportunity to explain the statement and to protect him from unfair surprise. (*Smith.*) If these purposes have been fulfilled, it is not required that all the conventional elements of foundation be presented. (*People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876; *People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.) In the case at bar, there can be no question that Pettis was aware of what Geisler was questioning him about. He had ample opportunity to explain the statement, and he clearly was not surprised. (Furthermore, the laying of this foundation occurred outside the presence of the jury, making it even less critical that the formal procedures be followed.) There was, then, no weakness in the foundation concerning time, place, and persons present.

The parties are in some disagreement concerning what further foundation is necessary to admit a prior inconsistent *written* statement into evidence. In *Illinois Central R.R. Co. v. Wade* (1903), 206 Ill. 523, 69 N.E. 565, the court used language which suggested that if a witness merely admits that a document contains his signature, then the contents of that document can be used to impeach him. Subsequent cases—in fact—followed this "rule." *Chicago City Ry. Co. v. Mauger* (1906), 128 Ill. App. 512; *Edmunds Manufacturing Co. v. McFarland* (1905), 118 Ill. App. 256; see also *Chicago City Ry. Co. v. Matthieson* (1904), 212 Ill. 292, 72 N.E. 443.

In *Belskis v. Dering Coal Co.* (1910), 246 Ill. 62, 92 N.E. 575, however, the court pointed out that, in addition to identifying his signature, the witness in *Wade* said that he understood the contents of the document when he signed it and that it had not been changed. Subsequent cases, then, have said that if a witness admits signing a document but repudiates its accuracy as an account of his statement or denies having had knowledge of its contents at the time he signed, further foundation testimony is required. (*Walker v. Shea-Matson Trucking Co.* (1951), 344 Ill. App. 466, 101 N.E.2d 449; *Horton v. Mozin* (1950), 341 Ill. App. 66, 92 N.E.2d 671 (abstract).) On the other hand, if the witness admits that he signed the document and does not repudiate its accuracy, then there is adequate foundation for its admission without testimony from any other person present when the statement was made. See *Laughlin v. Chenoweth* (1980), 92 Ill. App. 3d 430, 414 N.E.2d 1296.

It was, therefore, improper for the trial court to refuse to allow impeachment of Pettis on the ground that Geisler would have to testify in order to lay a proper foundation for admission of the prior inconsistent written statement. The trial court's position was well taken *before* the

offer of proof. At that stage, it was possible that Pettis would deny giving any statement to Geisler or would repudiate the accuracy of exhibit No. 1 as an account of his statement. During the offer of proof, however, Pettis admitted that exhibit No. 1 was *his statement*. At that point, it became clear that Geisler's testimony would not be necessary.

## II

On appeal, the State seeks to uphold the trial court's exclusion of Pettis' prior inconsistent written statement on the ground that Geisler acted unethically in obtaining it. The State relies heavily upon *Bruske v. Arnold* (1969), 44 Ill. 2d 132, 254 N.E.2d 453, *cert. denied* (1970), 398 U.S. 905, 26 L. Ed. 2d 65, 90 S. Ct. 1697. In that negligence case, a private investigator, hired by plaintiff's attorney, interviewed defendant without defendant's attorney present. The interview, consisting mostly of leading questions, was transcribed by a court reporter. The supreme court upheld the trial court's exclusion of the statement because it had been obtained in violation of the civil discovery rules and Canon 9 of the ISBA's Canons of Ethics. The court said that the fact a statement is illegally obtained does not necessarily make it inadmissible, but in this case the attorney's agent's actions justified the sanction:

> "In reaching this opinion, we are not unmindful that rules of discovery should not necessarily operate as exclusionary rules of evidence or that separate procedures exist for the regulation and discipline of unethical conduct on the part of attorneys. Rules, however, to be effective must carry an appropriate sanction; otherwise, the orderly process of a lawsuit is left to the mercy of the individual's sense of justice." (44 Ill. 2d 132, 136, 254 N.E.2d 453, 456.)

The State argues that Geisler violated Supreme Court Rule 7—104(a)(1) (79 Ill. 2d R. 7—104(a)(1)) and that we should rule that Pettis' prior inconsistent written statement was inadmissible because it was illegally obtained.

> "(a) During the course of his representation of a client a lawyer shall not
>
> (1) communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so * * *." 79 Ill. 2d R. 7—104(a)(1).

This case, however, differs somewhat from *Bruske*. Here we have no violation of a discovery rule, an action which itself can be grounds for excluding evidence. (See Ill. Rev. Stat. 1979, ch. 110A, pars. 219(c)(iv) and 415(g)(i).) Furthermore, it is not completely clear that Geisler violated

Rule 7—104(a)(1). That provision proscribes communication with "a party * * * in that matter * * *." We have been unable to find any case which has determined whether a person in Pettis' position (*i.e.*, being held in connection with the same criminal incident) should be considered a "party" for purposes of Rule 7—104(a)(1). We note again that *Bruske* says that the fact a statement is illegally obtained does not make it *per se* inadmissible. Under the present circumstances, where it is debatable whether Geisler violated Rule 7—104(a)(1), we conclude that the attorney's method of obtaining this statement was not itself a proper ground for excluding it from evidence.

## III

■■ As a dying gasp in its effort to persuade us that the trial court properly excluded Pettis' statement, the State argues that it was involuntary. *Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408, held that where a *Miranda* violation makes a criminal defendant's statement involuntary and thus untrustworthy, the statement is inadmissible even for purposes of impeachment. The State's claim that Pettis' statement was involuntary rests upon the fact that Geisler allegedly promised him immunity from perjury prosecution before taking the statement. Of course, Pettis could never have been prosecuted for perjury for that statement (see Ill. Rev. Stat. 1979, ch. 38, par. 32—2), and Geisler had no authority to make such a promise. But even assuming that Pettis did not know these legal matters, we do not see Geisler's alleged promise of immunity as making the statement *involuntary*. It may cast some doubt upon the statement's *trustworthiness* as an account of what Pettis actually thought at the time of the interview. But, we conclude that the promise does not taint the whole statement to such an extent that it should have been excluded from evidence.

■■ We agree with the State, however, that the exclusion of the statement was harmless error. It is hornbook law that a witness' prior inconsistent statement is admissible only to attack his credibility; it cannot be admitted as proof of the substance of the statement. (*People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564.) Thus, exhibit No. 1 was inadmissible to prove that defendant and Dave Pettis were not Fiorino's assailants or that the assailants were unarmed. Rather, the jury could properly use the exhibit only as evidence that Pettis could not be relied upon to tell the truth. However, while testifying, Pettis forthrightly admitted lying repeatedly to police. And as an apparent accomplice, Pettis was already subject to some suspicion.

Defendant claims that the trial court's error was prejudicial because it was important for the jury to know that Pettis had previously told a different story as to the key factors of identification of the assailants and

whether the assailants were armed. That contention, however, completely overlooks the fact that exhibit No. 1 could not properly be used to prove the matters contained in it. It is not important what Pettis may have lied about. Rather, the defense was entitled only to show that he was a liar. The jury had ample evidence before it showing that Pettis' credibility was subject to doubt; any evidence on that point in exhibit No. 1 would have been cumulative.

## IV

During his closing argument, the prosecutor said, "You know what's going to happen to [Reginold Penermon], ladies and gentlemen, if he didn't come down and say Michael Nance didn't have anything to do with it." The court overruled defendant's objection to this statement. On appeal, he contends that this argument was prejudicial because it was not based upon evidence in the record. (See *People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280.) We find the prosecutor's argument to be proper. Although Penermon replied, "No, I don't think so," to the prosecutor's suggestion that he would "have hell to pay" if he did not testify in defendant's favor, it was still an "arguable inference" from the evidence that Penermon was testifying under pressure from defendant, his cellmate. *People v. Hill* (1977), 45 Ill. App. 3d 14, 16, 358 N.E.2d 1350, 1351.

## V

Finally, defendant claims that the trial court erred in imposing an extended term of imprisonment under section 5—5—3.2(b)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(1)). That provision allows imposition of an extended term when a defendant has been "previously convicted in Illinois of the same or greater class felony, within ten years * * *." Defendant was convicted of armed robbery on March 1, 1978. Defendant claims that because armed robbery was a Class 1 felony prior to its reclassification, then he was not being convicted of the same class of felony as he had been on March 1, 1978. Defendant, however, seems to overlook the fact that the reclassification of armed robbery occurred on February 1, 1978, a month prior to his previous conviction. Thus, defendant's prior conviction *was* for the same class of felony.

Because no reversible error occurred at defendant's trial or sentencing hearing, his conviction and sentence are hereby affirmed.

Affirmed.

GREEN and LONDRIGAN, JJ., concur.