**UNITED STATES of America ex rel., Michael NANCE, Petitioner-Appellant,**

v.

**J.W. FAIRMAN, Warden, Pontiac Correctional Center, Respondent-Appellee.**

No. 82–2245.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1983.

Decided May 9, 1983.

James G. Woodward, Asst. State Appellate Defender, Springfield, Ill., for petitioner-appellant.

Michael V. Accettura, Asst. Atty. Gen., Springfield, Ill., for respondent-appellee.

Before CUDAHY and ESCHBACH, Circuit Judges, and ASPEN, District Judge.*

ASPEN, District Judge.

Petitioner Michael Nance was convicted of armed robbery in the Circuit Court of Macon County, Illinois. The Illinois Appellate Court affirmed, *People v. Nance,* 100 Ill.App.3d 1117, 56 Ill.Dec. 435, 427 N.E.2d 630 (4th Dist.1981), and the Illinois Supreme Court denied petitioner leave to appeal. Petitioner then filed for a writ of habeas corpus in federal district court, claiming that the conviction violated his Sixth Amendment right to confront witnesses against him. The district court denied the writ both on the merits and for petitioner's failure to exhaust his constitutional claim by failing to raise it in the state courts. For reasons set forth below, we affirm the decision of the district court.

## I.

The victim of the armed robbery, John Fiorino, testified at trial that as he rode his motorcycle down a Decatur street on August 5, 1980, a man on a bicycle stopped to converse with him. Two men seated on a retaining wall across the street called to Fiorino to come over to them. As Fiorino neared them, one of the men put a handgun to the back of Fiorino's head and demanded money and cocaine. Fiorino stated that he had neither, and the men took his wristwatch, wallet and keys to his motorcycle. Although shortly after the robbery he was unable to identify petitioner from a photo display, at trial Fiorino identified petitioner as the gunman and Julius Pettis ("Julius") as the man upon the bicycle.

* The Honorable Marvin E. Aspen, United States District Judge for the Northern District of Illinois, is sitting by designation.

1. Julius had also been charged along with petitioner for the armed robbery, but subsequently received immunity in exchange for his testimony.

Petitioner's habeas claim focuses on the alleged restriction of his cross-examination of Julius, who testified for the State.[1] On direct examination, Julius testified that he had complimented Fiorino on his motorcycle, and that Fiorino then asked him if he knew anyone who wanted to buy cocaine. Julius left the immediate area to speak to his brother, Dave Pettis ("Dave"), and petitioner, who told him to send Fiorino over to meet with them. Julius relayed the message, and Fiorino then joined Dave and petitioner across the street. Julius testified that he saw petitioner place a handgun near Fiorino's ear. After Fiorino had been ordered to leave the scene, Julius stated that he saw petitioner search the saddlebags of the motorcycle.

On cross-examination, Julius admitted that two days after the robbery, he told investigating officers that he had observed petitioner and Fiorino together earlier in the evening of June 5, 1980, that he was some distance down the street from where the robbery occurred, and that his brother Dave was the gunman. Also during cross-examination, petitioner's attorney, Gary Geisler, showed Julius a transcript of a statement Julius made while he was in custody on November 5, 1980. This transcript was handwritten by Geisler and signed by Julius. Julius also admitted signing a typewritten version of the document. The trial court, however, refused to permit Julius to be cross-examined on these documents. Thus, the trial court did not permit Julius to be cross-examined on his statement that he did not see either of the robbers with a gun, which was inconsistent with Julius' direct testimony that Michael Nance was the gunman at the armed robbery.

Prior to Geisler's attempted offer of proof, a colloquy took place between Geisler, the prosecutor and the Court,[2] which culminated as follows:

2. THE COURT: ... Now then let's see where we're going. What you have is evidently something you have prepared and had him to sign. Is that right?
    MR. GEISLER: That is correct, Your Honor.
    THE COURT: What is it supposed to be? A statement of his?

THE COURT: Let's go to the Court's ruling. Number one, the question is improper as an attempted impeachment without any foundation whatsoever. To impeach a witness you have to lay foundation as to time and place, who was present, say the least. Number two I sustained it because if he should answer no, then it would be necessary for you to testify to complete the impeachment, and that, of course, I was trying to avoid because

> MR. GEISLER: A statement of his recollection to the entire incident, Your Honor.
>
> THE COURT: Once again, at the time you prepared this and so forth, was he represented by counsel? We have a matter of procedure that we've got into a lot of times like this of, of you going to witnesses and purported record of something they said and sometimes they're not represented by counsel, and then we get into the matter of proof of an attempted impeachment, and you then have to be a witness and as counsel and witness you're in a dual capacity.
>
> \* \* \* \* \* \*
>
> THE COURT: Let's get to the ultimate question: What are you trying to prove?
>
> MR. GEISLER: Your Honor, I am attempting to prove that in the statement he said he did not see Mike Nance have a gun in his hand, he did not see anyone put a gun to this man, and did not see anyone go through the man's things.
>
> THE COURT: What you're trying to prove is, impeach him as to his testimony here that this defendant, Mr. Nance is the one he saw put the gun to the victim's head. Right?
>
> MR. GEISLER: That's right.

3.  Q. Mr. Pettis, referring to Defendant's Exhibit No. 1, that's a written document of some five pages. Is that correct?
   A. Yes.
   Q. Have you seen that document before?
   A. Yes.
   Q. Did you read through that document before?
   A. I read through a copy that you gave me, yes.
   Q. You have a copy of that document, do you not?
   A. Yes.
   \* \* \* \* \* \*
   Q. Does this document set forth the conversation that you and I had with respect to the occurrence that you're testifying about today?
   A. Yes, you know, you just told me, do you ah testimony.
   Q. Did we discuss this occurrence you had observed on August 5th?
   A. Yeah, we discussed that but—

when you become a witness you no longer are competent as counsel. You can't have a dual role. You'd have to withdraw.

Let's go back to number one, that means that I sustained the objection, no foundation as far as the place, the time and who was present.

The court then allowed Geisler to question Julius as part of an offer of proof,[3] but denied the offer:

> Q. Okay—
> THE COURT: Let him finish his answer, please.
> A. We discussed it but, you know like he told me, you know he said that, you know I won't get no perjury or nothing, he just said give him a statement. So I gave him a statement.
> Q. Did I ask you these questions and did you give me these answers?
> A. Yes, you asked me—
> Q. Did I promise you that you would never get charged with perjury in this case?
> A. Yes, you said that I wouldn't be charged with no perjury and yes, then I gave you the statement.
> Q. Are you saying that this statement is all lies?
> A. Yes.
> \* \* \* \* \* \*
> Q. Did I ask you to lie in this statement?
> A. No, you didn't me, you know, you didn't ask me to, no.
> Q. Did I tell you to lie in the statement?
> A. No, you didn't tell me to lie.
> Q. You did say the things that are in the statement, didn't you?
> A. Yeah, I answered the questions.
> MR. GEISLER: That's our offer of proof, Your Honor.
> THE COURT: Well again what purpose is it being used? Let's get around to the matter of, you're laying the foundation for attempted impeachment. But then to impeach you go to a document did I say and did you answer so forth or did you say, question and answer, is the way to complete the impeachment. Let's get to what part of the document, if it were competent, is material to the issue as far as impeaching the witness.
> MR. GEISLER: All right.
> Further questions by Mr. Geisler:
> Q. Mr. Pettis, at the point in the statement where there is reference made to observing the people in the parking lot, was the question asked: Could you see them? And what was your answer to that question?
> A. I said that I couldn't see nothing, I could only see the top of two peoples' head.
> Q. Did I ask the question: So you were not positive that it was David and Nance?

THE COURT: The Court is going to rule as follows. The Court is ruling, number one, the method and manner of the attempted impeachment is not correct, and the objections to this approach are sustained.

Commenting, I feel that this is not the accepted method at all in the way in which it should be done. With that are we ready—the offer of proof is denied.

The Court denied the offer of proof on the grounds that a proper foundation as to the time and place of the interview had not been laid, Julius' counsel had not been present at Geisler's interview, and the Court wished to avoid placing Geisler in the position of becoming a witness at the trial in the event that Julius denied making the statement.

Petitioner argued before the Illinois Appellate Court that the state trial court erred in excluding evidence of Julius' prior inconsistent statement in that a sufficient foundation had been laid for the statement. The Appellate Court agreed that it was improper for the trial court to refuse to allow impeachment of Julius:

> The trial court's position was well taken *before* the offer of proof.... During the offer of proof, however, Pettis admitted that exhibit No. 1 was *his statement.* At that point, it became clear that Geisler's testimony would not be necessary.

100 Ill.App.3d at 1122–23, 56 Ill.Dec. at 439, 427 N.E.2d at 634. The Appellate Court went on to hold that the exclusion of Julius' statement constituted harmless error. The court reasoned that a witness' prior inconsistent statement can be admitted only to attack his credibility and not to prove the truth of the matter asserted. Julius' statement, the Court noted, could be used solely to demonstrate his untruthfulness. The Appellate Court concluded that since there was ample evidence of Julius' lack of credibility already before the jury, including Julius' declaration that he was lying when he told the police that his brother used the handgun, evidence concerning Julius' inconsistent statement would have been cumulative. Thus, its exclusion was harmless.

In denying the petition for a writ of habeas corpus, the district court held that since petitioner failed to present his Sixth Amendment arguments to the state courts, the exhaustion requirement was not satisfied. The Court also denied the petition on the merits, holding that any error in omitting Julius' inconsistent statement was harmless, and that "the identical content of the statement made to Geisler was presented to the jury upon cross-examination of Pettis when he admitted making the statement that his brother was the gunman to an investigating police officer." *United States ex rel. Nance v. Fairman,* No. 82–3107 at 5 (C.D.Ill. June 22, 1982).

## II.

We will first consider whether petitioner has exhausted his available state remedies. The principle that a state prisoner must exhaust available state remedies before a federal district court may grant his petition for habeas corpus relief has been well settled since *Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886). Con-

A. Yeah.
Q. What was your response?
A. No, I can't tell.
Q. Then was the question asked: Did you see either of the two people pull a gun out? Was that question asked?
A. Yes.
Q. What was your answer?
A. I said no.
Q. And was the question asked: Did you see either of them go through Fiorino's things?
A. I said no.
Q. That was—that question was asked and your answer was

A. Yeah.
Q. And was the question asked: Did you see either of them talking to Fiorino?
A. Yes.
Q. And what was your answer?
A. I said no.
Q. And was the question asked: Did you ever see Nance with a gun that day?
A. Yes.
Q. And what was your answer?
A. No.
MR. GEISLER: Your Honor, that's the substance of the impeachment I am interested in.

gress codified this principle in 28 U.S.C. § 2254.[4] *See Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The exhaustion doctrine reflects a policy of federal-state comity:

> The exhaustion doctrine is principally designed to protect the state court's role in the enforcement of federal law and prevent disruption of state judicial proceedings. Under our federal system, the federal and state "courts [are] equally bound to guard and protect rights secured by the Constitution." Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."

*Rose v. Lundy,* 455 U.S. at 518, 102 S.Ct. at 1203, 71 L.Ed.2d at 387 (citations omitted). *See also, Wilwording v. Swenson,* 404 U.S. 249, 252, 92 S.Ct. 407, 409, 30 L.Ed.2d 418 (1971). The exhaustion requirement is based both upon a desire to avoid undue federal judicial burdens and upon principles of federal-state comity. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783 (1982). Accordingly, exceptions to the exhaustion requirement are made only if there is no opportunity to obtain redress in state court or if an attempt to invoke state remedies would be futile. *Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1, 4 (1981). Nevertheless, considerations of comity are satisfied if state courts

are given a fair opportunity to address the federal constitutional issue. *Picard v. Connor,* 404 U.S. at 275, 92 S.Ct. at 512, 30 L.Ed.2d at 443 (1971). As this Court has recently explained:

> A federal habeas corpus petitioner has "fairly presented" a claim to a state court if he has clearly informed the state court of the factual basis of that claim and has argued to the state court that those facts constituted a violation of the petitioner's federal constitutional rights. It is sufficient that the "substantial equivalent" or "substance" of the federal habeas corpus claim has been presented.

*Toney v. Franzen,* 687 F.2d 1016, 1021–22 (7th Cir.1982).

Consistent with the foregoing, it is also true that a difference in legal theory between that urged in the state court and what is presented in a habeas corpus petition does not satisfy the exhaustion requirement. *Wilks v. Israel,* 627 F.2d 32, 38 (7th Cir.1980), *cert.* denied, 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981). But a habeas corpus petition which presents a mere variation in legal theory, rather than a different legal claim from that presented in state court, will not run afoul of the exhaustion doctrine. *Macon v. Lash,* 458 F.2d 942, 948 (7th Cir.1972).

Applying these principles to this case, it is clear that the exhaustion requirement has not been satisfied. Petitioner's brief to the Illinois Appellate Court argued that the exclusion of Julius' prior inconsistent statement violated Illinois evidence law. It raised no constitutional question. Thus, petitioner never argued to a state court that the exclusion of Julius' prior inconsistent statements violated his Sixth Amendment rights, nor did he present the sub-

---

4. Title 28 U.S.C. § 2254 provides in pertinent part:

   (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State correc-

tive process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

   (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

stance of his habeas corpus claim to the state courts, as required by *Toney v. Franzen,* 687 F.2d 1016, 1021–22 (7th Cir.1982).

The instant habeas petition does not involve a "mere variation" in legal theory from that presented in state courts, *Macon v. Lash,* 458 F.2d 942, 948 (7th Cir.1972), but rather, raises a different legal theory from that urged in the Illinois Appellate Court. *Wilks v. Israel,* 627 F.2d 32, 38 (7th Cir. 1980), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981). There is no doubt that the claim presented to the state courts arises out of the same factual circumstances as petitioner's constitutional claim. But merely presenting the facts of a case to a state appellate court is insufficient for purposes of exhaustion. *Spurlark v. Wolff,* 699 F.2d 354 at 356 (7th Cir.1983). Moreover, the issue presented to the state courts is a different legal issue from that presented in the federal court. The analysis employed in considering the exclusion of Julius' statement relied upon Illinois evidence law. However, the inquiry under the Sixth Amendment confrontation clause focuses upon whether a defendant received an adequate opportunity for effective cross-examination, *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965), and whether a defendant's inability to make a particular inquiry on cross-examination was prejudicial to him by depriving him of an ability to test the truth of a witness' direct testimony. *Blackwell v. Franzen,* 688 F.2d 496, 500 (7th Cir.1982);

*Mattes v. Gagnon,* 700 F.2d 1096 at 1101 (7th Cir.1983). We find these issues substantially different; considerations of federal-state comity require that the state courts first hear the substance of the constitutional claim.

■ Petitioner now contends that since the Appellate Court determined that the evidentiary claim raised there was harmless error and that since the harmless error question must be similarly analyzed by this Court in deciding the confrontation claim, the essence of his argument here was before the state court and therefore was properly exhausted. We find this argument disingenuous. Exhaustion is determined by the threshold question of whether the claim raised here was in fact raised in the state court—not by whether the distinct claims, if established, both might ultimately be disposed of on the basis of a similar analysis of harmless error.[5]

For these reasons the state court did not have a fair opportunity to consider the substance of petitioner's constitutional claim, and he has not met the exhaustion requirement.

### III.

Although petitioner lacks standing before this Court because he failed to exhaust his state remedies, his claim also fails on the merits since we conclude that petitioner has not been denied his Sixth Amendment right to confront witnesses.[6]

---

5. A harmless error analysis does not necessarily invoke constitutional law. The Supreme Court has held that some constitutional errors may be so unimportant in a particular case that they may be deemed harmless, but such errors must be harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Mattes v. Gagnon,* 700 F.2d 1096 at 1104–1105 (7th Cir.1983). A different standard, however, is applied for errors that are not of constitutional dimension. *United States v. Panczko,* 429 F.2d 683, 686 (7th Cir.1970), *cert. denied,* 400 U.S. 946, 91 S.Ct. 253, 27 L.Ed.2d 252 (1970). If an error, not of constitutional dimension, had substantial influence over a jury, the conviction must be overturned. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

6. The right to confront witnesses, while not absolute, is a fundamental prerequisite for due process of law and a fair trial. *Chambers v. Mississippi,* 410 U.S. 284, 294–95, 93 S.Ct. 1038, 1045–46, 35 L.Ed.2d 297, 308 (1973). It is settled that the Sixth Amendment's guarantee of the right to confront witnesses applies to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). A crucial aspect of the right of confrontation is cross-examination of witnesses, which is the principal means of testing a witness' credibility and the truth of his testimony. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974). Criminal defendants must be given an opportunity to fully and effectively cross-examine witnesses against them. *Flewallen v. Faulkner,* 677 F.2d 610, 612 (7th Cir.1982) (per

■ While we do not necessarily agree with the district court judge's conclusion that "the identical content of the statement made to Geisler was presented to the jury upon cross-examination of Julius when he admitted making the statement that his brother Dave was the gunman to an investigating police officer," *United States ex rel. Nance v. Fairman,* No. 82–3107 at 5 (C.D.Ill. June 22, 1982), it is clear that the jury had ample evidence before it which undermined Julius' direct testimony. The jury learned of Julius' statement to an investigating officer that Dave, not petitioner, was the gunman. On cross-examination, Julius claimed that this statement to the officer was untrue. As this Court recently observed, a confrontation clause analysis

> does not require a reviewing court to isolate the particular limitation on cross-examination. Rather, "the question in each case must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness' direct testimony. To answer that question the court must look to the record as a whole, and to the alternative means open to defendant to impeach the witness.

curiam), *cert. denied,* —— U.S. ——, 103 S.Ct. 214, 74 L.Ed.2d 170 (1982). Moreover, exposure of a witness' biases, prejudices or ulterior motives, in addition to generally attacking his credibility, is an important element of cross-examination. *Davis v. Alaska, supra.*

7. Petitioner emphasizes that excluding Pettis' statements to Geisler prevented the jury from knowing that Pettis told a different version of what he claimed to have seen at the crime. But a review of Pettis' cross-examination reveals that the jury had evidence before it that Pettis related a different version of the incident in question to a police investigator:

Q. All right, you recall talking to Detective Bell about this incident?
A. Who?
Q. Detective Bell, a white detective?
A. I don't remember, yeah I probably did.
Q. You remember telling him that you were standing in front of Video Connection when this—
A. Yeah I told you, I told him a lot of things, I lied to the man quite a lot.
Q. Well, that's the second police officer that you lied to. Is that right?
A. Yes, sir.

*Blackwell v. Franzen,* 688 F.2d 496 (7th Cir.1982). Excluding Julius' prior inconsistent statement did not prejudice petitioner by depriving him of the ability to test the truth of Julius' direct testimony, since petitioner was able to impeach Julius by alternative means.[7] Thus, any error was harmless.

### Conclusion

Petitioner failed to present the instant claim to the state court and, thus, has not met his exhaustion prerequisite. Even if this claim had properly been preserved, any error by the trial court was harmless. For these reasons, we affirm.

CUDAHY, Circuit Judge, concurring in Parts I and II and in the result.

I agree that Nance's Confrontation Clause claim was not exhausted.

I think there may be some question whether the exclusion of the evidence impeaching Julius' testimony, even though it violated Illinois evidence law, rose to the level of a federal constitutional violation. It does not necessarily follow that, because

Q. Now is it your testimony today that Mike Nance pulled that gun out?
A. Yes, sir.
Q. You recall telling Detective Bell that it was David Pettis, your brother, that pulled the gun out?
A. Yeah I told, I told the man that because the man, he told me—
Q. My question is, did you tell him that?
A. Yeah I told the man that, yes.
Q. Now is David Pettis your brother?
A. Right. Well, just like you know—I ain't going into that much, you know, that's what, his mother, my grandmother, his mother, adopted me when I was young. So you know that's how it is there.
Q. Well your testimony today is that he is your brother. Is that right?
A. Yeah, that's what I am saying, yes.
Q. So you told the police officer that you saw your brother pull a gun out. Is that right?
A. Yes, that's what I told him.
Q. But you were lying about that?
A. Yes.

evidence has been excluded in breach of state law, a constitutional violation has been shown. *See Carbajol v. Fairman,* 700 F.2d 397 at 401–402 (7th Cir.1983).[1]

But, if there has been a constitutional violation, I cannot agree that it was harmless. The excluded evidence involved not general evidence of Julius' propensity to lie but specific lies about the matter in issue. The excluded evidence may be "cumulative" of other lies, but the evidence is so central it requires a leap of faith of which I am incapable to dismiss it as "harmless."

---

[1]. Perhaps, when it speaks of the error here as "harmless," the majority is addressing the question whether the state violation rose to federal constitutional dimensions. But this is not entirely clear to me.