**GRIEVANCE COMMITTEE FOR the SOUTHERN DISTRICT OF NEW YORK, Petitioner–Appellee,**

v.

**Robert M. SIMELS, Respondent–Appellant.**

**No. 1679, Docket 94–6003.**

United States Court of Appeals, Second Circuit.

Argued June 23, 1994.

Decided Feb. 8, 1995.

---

Kevin J. Burke, New York City (Cahill Gordon & Reindel, New York City, Special Counsel), for petitioner-appellee.

Elkan Abramowitz, New York City (Jamie L. Kogan, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, of counsel), for respondent-appellant.

Before: MAHONEY and JACOBS, Circuit Judges, and TRAGER, District Judge.*

---

* The Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

1. DR 7–104 ("Communicating with One of Adverse Interest") provides:

A. During the course of his representation of a client a lawyer shall not:
 1. Communicate or cause another to communicate on the subject of the representation with

TRAGER, District Judge:

Robert M. Simels, an attorney, appeals from an unpublished opinion and order of the Committee on Grievances for the Southern District of New York ("Committee"), *In re Simels*, No. M2–238, 1993 WL 524939 (S.D.N.Y. Dec. 10, 1993), imposing on him a sanction of censure. The Committee found that Simels violated Disciplinary Rule 7–104(A)(1) ("DR 7–104(A)(1)" or "Rule") of the American Bar Association's Code of Professional Responsibility ("Code")[1] when he contacted one Aaron Harper, whom Simels knew to be represented by counsel. Harper had been charged with participating in the attempted murder of a government witness in a drug conspiracy trial in which Simels' client, Brooks Davis, was a defendant, had agreed to cooperate with the government and had implicated Davis in the shooting. Prior to Simels' contact with Harper, the government had informed Davis (and Simels) that it would be filing a complaint against Davis and two other codefendants in connection with the attempted murder of the government witness. Because in our view the Committee erroneously interpreted DR 7–104(A)(1), we reverse.

## BACKGROUND

On Monday, April 11, 1988, a large-scale, multi-defendant drug conspiracy trial, entitled *United States v. Davis et al.*, was scheduled to commence before Judge Thomas Griesa in the Southern District of New York. The defendants in that trial were Brooks Davis (Simels' client), Claddis Arrington, Mary Davis (Brooks Davis' wife) and Wayne Davis (not related to Brooks and Mary Davis).

On the Saturday preceding the first day of trial, Isaac Diggins, a government witness in the drug conspiracy case, was shot and seri-

---

a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

. . . . .

The Southern District's General Rule 4(f) makes DR 7–104 of the Code (and its New York equivalent) applicable to attorneys appearing in that court.

ously injured. On Sunday, Aaron Harper was arrested in connection with the shooting. After several hours of questioning, Harper told authorities that Arrington had stated that he wanted Diggins killed, and had asked Harper to lead Diggins to the scene of the shooting. Harper was arraigned in District Court on the morning of Monday, April 11, 1988, and counsel was appointed for him.

That same day, jury selection in the drug conspiracy case began. The government requested an anonymous jury and that the codefendants, who had been out on bail, be remanded because it had information from a confidential informant that Arrington was responsible for the attempted murder of Diggins. The government also announced that it would be filing a complaint against Brooks Davis, Arrington and Wayne Davis, charging them with attempted murder, obstruction of justice and tampering with a witness in connection with the shooting.

While Harper was awaiting arraignment before a Magistrate Judge, he came across Arrington in the holding pens. Later that day, Harper again encountered Arrington, along with Brooks Davis and Wayne Davis, all of whom were being held at the Manhattan Correctional Center ("MCC"). What exactly was said during these encounters is uncertain, except that Brooks Davis told Harper that he would be sending his lawyer to speak with him.[2] Sometime that same afternoon, Brooks Davis telephoned Simels from the MCC and told him to interview Harper because Harper might have information relevant to Davis' defense. Harper's name had been kept confidential and was not on the government's list of potential witnesses in the drug conspiracy trial.

The next morning, April 12, Simels went to interview Harper, introducing himself as Brooks Davis' attorney. During the interview, Simels learned about the circumstances surrounding Harper's arrest and incarceration and that the court had appointed counsel for him, although Harper was unable to recall the name of the attorney. Harper also stated that he and his family were in the process of retaining private counsel. Simels inquired about the shooting and the government's interrogation of Harper, and had an affidavit prepared which Harper signed the same day.[3] At no point during this exchange did Simels make any attempt to contact Harper's attorney.

The Acting United States Attorney for the Southern District of New York reported Simels' conduct to the Committee on Grievances, which determined that the conduct merited prosecution. Judge Griesa, who was also the Chairman of the Committee, appointed Special Counsel to prosecute the charges and named a three-member Panel, headed by retired Chief Judge Fuld of the New York Court of Appeals, to hear evidence and report to the Committee. The "Second Count" of the Statement of Disciplinary Charges alleged a violation of DR 7–104(A)(1) arising out of Simels' contact with Harper.[4]

On April 11, 1991, the Panel submitted its Findings of Fact and Conclusions of Law recommending that all charges against Simels be dismissed. With respect to the DR

---

**2.** Although this particular fact is not contained within the Panel's Findings of Fact, it is contained in the facts found by Judge Griesa during the drug conspiracy trial, which a panel of this Court ultimately accepted in United States v. Arrington, 867 F.2d 122 (2d Cir.), cert. denied, 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989); see infra note 3.

**3.** When the affidavit was presented to Judge Griesa during the drug conspiracy trial and the circumstances surrounding its creation were revealed, the District Court declared a mistrial and disqualified Simels from serving as defense counsel because Davis' co-defendants stated that they would call Simels to testify in order to counter Harper's testimony. This Court upheld the deci-

sion to grant a mistrial and affirmed the District Court's denial of the defendants' motions, made prior to re-trial, to dismiss the charges on double jeopardy grounds in Arrington, 867 F.2d at 122.

**4.** In addition to the alleged violation of DR 7–104(A)(1) stemming from the contact with Harper, Special Counsel also charged Simels with professional misconduct for knowingly presenting a false affidavit to the trial court and for using threats to obtain Harper's signature in violation of DR 7–104(A)(4), (6) and (8). Special Counsel also alleged a separate violation of DR 7–104(A)(1) because Simels procured an exculpatory affidavit from another codefendant of Davis, Henri Mitchell, who had pled guilty and agreed to testify against Davis at trial.

7–104(A)(1) violation, the Panel interpreted the Rule as:

> requir[ing] an exceedingly narrow definition of "party" if the prohibitions of DR 7–104 are to be involved.

> . . . . .

> It is our view . . . that DR 7–104 does not bar an attorney from communicating with one scheduled to appear as a witness or with his client's codefendant, even though the one to be interviewed is represented by counsel.

Panel's Findings of Fact and Conclusions of Law at 13, 16.

On December 8, 1993, the Committee issued its Opinion and Order accepting the Panel's Findings of Fact, but reversing the Panel's Conclusions of Law with respect to that portion of the "Second Count" which charged a violation of DR 7–104(A)(1). Focusing on the attempted murder of Diggins (the government witness in the drug conspiracy case) as the pertinent "matter," the Committee concluded that because Davis and Harper were facing or were about to face identical charges,

> [t]he word "party" is, on the facts presented here, broad enough to encompass the relationship between Harper and Simels' client, Brooks Davis. At the time he interviewed Harper, Simels knew that the prosecutor either had filed, or in the near future would file, against Simels' client charges identical to those on which Harper was being held. While Harper and Davis may not have been named in the same accusatory instrument, they were charged with the same crime.

> There can be no doubt that had Brooks Davis and Harper been charged in the same complaint or indictment, they would be considered "parties" on even the most

technical construction of that term. Black's Law Dictionary (Fifth Edition) (p. 1010)

. . . . .

*Simels*, slip op. at 4–5. The Committee further found that because the affidavit Simels had procured from Harper could have been used against Harper, "the interests of Harper and Brooks Davis were 'adverse' at the time [Simels] took the statement." *Id.* at 7. After concluding that Simels had violated DR 7–104(A)(1), the Committee imposed the sanction of censure. *Id.* at 8.[5] This appeal followed.

## DISCUSSION

■ This appeal requires a determination of whether Davis and Harper were "part[ies]" in the same "matter" such that, before talking to Harper, Simels should have sought permission from Harper's attorney after learning that counsel had been appointed for Harper. The Committee's interpretation of DR 7–104(A)(1) as applied to federal criminal proceedings raises important issues of policy affecting federal law enforcement and the ability of defense counsel to provide the effective assistance and zealous representation that the Sixth Amendment and DR 7–101, respectively, guarantee to criminal defendants. We believe that the Committee's interpretation may well result in broad and unwarranted changes in traditional law enforcement and defense practices and procedures. If such substantial modifications are to be made, they should occur only after careful consideration by the representative branches of the federal government. The conceded power of federal district courts to supervise the conduct of attorneys should not be used as a means to substantially alter federal criminal law practice.[6] Although it

---

5. The Committee dismissed the other allegations of misconduct alleged in the "First Count." With respect to the "Second Count" relating to the interview of Henri Mitchell, the Committee "considers any action . . . unnecessary in view of the discipline being imposed for the Harper incident." The district court affirmed the dismissal of the Mitchell charge. On appeal, Special Counsel contends (Brief for Petitioner–Appellee at 11 n. 3) that a reversal requires a remand in order for the Committee to consider whether the allegation of professional misconduct arising out of Simels' contact with Henri Mitchell should be sustained. In light of our analysis and disposition here, we see no basis for doing so.

6. That is not to say, however, that the Supreme Court, through its rule-making power, could not promulgate a rule similar to DR–7–104(A)(1), which would then apply uniformly to all attorneys in federal criminal prosecutions. Such a proposed rule would, of course, be subject to a

may well be that DR 7–104(A)(1) can reasonably be read, as the Committee did, to find that the word "party" is broad enough to encompass the relationship between Davis and Harper, as we view the issues, a narrow interpretation of the Rule is the wiser course for the federal courts to follow. Accordingly, we disagree with the Committee's expansive interpretation of DR 7–104(A)(1) and, therefore, reverse. In interviewing Harper, Simels was interviewing a potential witness in the drug conspiracy case and a potential codefendant of his client in a related but distinct matter, the attempted murder of Diggins. In neither case was Harper a "party" in the same "matter."

### A. This Court's Role When Interpreting a Disciplinary Rule

■ The decision whether to impose disciplinary sanctions on an attorney is usually subject to an abuse-of-discretion standard of review. *In re Grievance Committee*, 847 F.2d 57, 61 (2d Cir.1988). As both parties acknowledge, however, where the issue presented for our review is the Committee's interpretation of a particular disciplinary rule, Circuit review is plenary. *Id.* ("Because resolution of such questions leaves little leeway for the exercise of discretion, appellate review in those cases is plenary.") (citations omitted). Accordingly, whether Davis and Harper were parties in the same matter under DR 7–104(A)(1) is subject to *de novo* review.

■ Before beginning our analysis, two important caveats concerning the role of this Court in resolving the issue should be noted. First, in determining the scope of a particular disciplinary rule, we recognize that the rules of ethics are not statutes, but standards of conduct. Accordingly, although "plain meaning" or "intent of the drafters" interpretative standards are appropriate when the disciplinary rule in question is unambiguous, where, as in the case of DR 7–104(A)(1), neither the plain meaning nor the intent of the drafters can be discerned from the face of the rule, matters of policy are appropriately considered in determining its scope. *Armstrong v. McAlpin*, 625 F.2d 433, 444 n. 22

(2d Cir.1980) (*en banc*) (plain meaning analysis inappropriate where disciplinary rule is ambiguous), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *J.P. Foley & Co. v. Vanderbilt*, 523 F.2d 1357, 1359–60 (2d Cir.1975) (Gurfein, J., concurring) (matters of policy can inform a court's interpretation of a disciplinary rule); *see also Niesig v. Team I*, 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990) (in determining scope of "party" in DR 7–104(A)(1), court should consider competing policy issues and not be bound by "plain meaning" analysis). Considering matters of policy is particularly important in this case because how DR 7–104(A)(1) is interpreted today will directly affect the way defense attorneys as well as prosecutors litigating in the federal courts of this Circuit conduct themselves. This, in turn, could have a dramatic impact on both the outer limits of a defendant's right to the effective assistance of counsel and the public's interest in effective law enforcement.

■ Second, in considering the various policy issues influenced by the Rule, well-established principles of federalism require that federal courts not be bound by either the interpretations of state courts or opinions of various bar association committees. Both parties rely on those authorities to support their arguments for either a strict or broad interpretation of the Rule. Although these precedents are no doubt helpful, they should be relied upon only to the extent that they are compatible with federal law and policy. *See Baylson v. Disciplinary Board*, 975 F.2d 102 (3d Cir.1992) (invalidating state ethics rule that attempted to interfere with federal grand jury practice), *cert. denied*, —— U.S. ——, 113 S.Ct. 1578, 123 L.Ed.2d 147 (1993); *Almond v. United States District Court*, 852 F.Supp. 78, 87 (D.R.I.1994) (same). Indeed, requiring a federal court to follow the various and often conflicting state court and bar association interpretations of a disciplinary rule, interpretations that may also contravene important federal policy concerns, threatens to balkanize federal law. *See* Cramton & Udell, *State Ethics Rules and*

Congressional veto under the Rules Enabling Act. *See* 28 U.S.C. § 2074.

*Federal Prosecutors: The Controversies Over the Anti–Contact and Subpoena Rules,* 53 U.Pitt.L.Rev. 291, 315 (1992) (discussing the increasing divergence in states' interpretations of DR 7–104(A)(1) and its threat to federal uniformity); *see also Rand v. Monsanto Co.,* 926 F.2d 596, 600 (7th Cir.1991) (permitting state ethics rule on champerty to trump Federal Rule of Civil Procedure 23 would "balkanize litigation"). If a particular interpretation of a state ethics rule is inconsistent with or antithetical to federal interests, a federal court interpreting that rule must do so in a way that balances the varying *federal* interests at stake. *See generally Resolution Trust Corp. v. Bright,* 6 F.3d 336, 341 (5th Cir.1993) (although Texas disciplinary rule applies to motion to disqualify in federal court, "such a motion must be determined by standards developed under federal law"); *Rand,* 926 F.2d at 600 (Federal Rule of Civil Procedure 23 trumps state ethics rules on champerty); *Kolibash v. Committee on Legal Ethics,* 872 F.2d 571, 575 (4th Cir. 1989) (proper for federal prosecutor to remove state disciplinary proceeding to federal court because although "[r]egulation of the legal profession admittedly implicates significant state interests, ... the federal interest in protecting federal officials in the performance of their federal duties is paramount.").

▮ Thus, the interpretation of DR 7–104(A)(1) as it applies to federal criminal law practice should be and is a matter of federal law. *In re Snyder,* 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985) (because "[f]ederal courts admit and suspend attorneys as an exercise of their inherent power[,] the standards imposed are a matter of federal law."); *Cord v. Smith,* 338 F.2d 516, 524 (9th Cir.1964) ("When an attorney appears before a federal court, he is acting as an officer of that court, and it is that court which must judge his conduct."); *see also United States v. Hammad,* 858 F.2d 834, 837 (2d Cir.1988), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990). It follows, therefore, that "[a] federal court is not bound by New York's view of what con-

stitutes ethical professional conduct." *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1413 (E.D.N.Y.1989), *aff'd on other grounds,* 907 F.2d 1295 (2d Cir.1990); *see Cord,* 338 F.2d at 524 (declining to follow California case law in applying a disciplinary rule in a diversity-contract action governed by California law); *Figueroa–Olmo v. Westinghouse Electric Corp.,* 616 F.Supp. 1439, 1449–50 (D.P.R.1985) (refusing to follow Puerto Rico Supreme Court precedent on ethical rule despite local rule adopting Puerto Rico's rules of ethics as rules for federal court because "the primary responsibility for supervising the conduct of attorneys who practice before this court lies precisely with this forum."); *Black v. State of Missouri,* 492 F.Supp. 848, 874–75 (W.D.Mo.1980) (declining to follow Missouri Bar Advisory Committee's opinion-letter addressing the specific ethical issue that arose in the litigation). As we are not bound by New York's (or any state court's) view of the Code, and for the reasons discussed below, we decline to follow the ethics opinions cited by the Committee, *see, e.g.,* New York County Lawyer's Ass'n Comm. on Professional Ethics, Op. 676 (1990), and the state cases cited by both parties. *Compare In re Thompson,* 492 A.2d 866 (D.C.1985) *and In re Mahoney,* 437 N.E.2d 49 (Ind.1982) (cited by Special Counsel) *with People v. Nance,* 100 Ill.App.3d 1117, 56 Ill.Dec. 435, 427 N.E.2d 630 (1981) (cited by Simels). With these caveats in mind, we turn to the matter at hand.

B. *The History of DR 7–104(A)(1) and Second Circuit Precedent Interpreting DR 7–104(A)(1) in Criminal Cases*

▮ DR 7–104 ("Communicating with One of Adverse Interest")[7] provides:

A. During the course of his representation of a client a lawyer shall not:

1. Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the

---

**7.** Model Rule 4.2 of the American Bar Association's Model Rules of Professional Conduct is nearly identical to DR 7–104(A)(1) of the Code, except for one crucial distinction. Model Rule 4.2 contains no "adverse interest" requirement. Thus, cases and scholarly literature interpreting Model Rule 4.2 are to that extent inapposite to our construction of DR 7–104(A)(1) in this case.

lawyer representing such other party or is authorized by law to do so.

.   .   .   .   .

DR 7–104(A)(1), which has existed since 1908, presumably protects "a defendant from the danger of being tricked into giving his case away by opposing counsel's artfully crafted questions." *United States v. Jamil,* 707 F.2d 638, 646 (2d Cir.1983), *citing United States v. Massiah,* 307 F.2d 62, 66 (2d Cir. 1962), *rev'd on other grounds,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). This provision has also been said to further other interests, such as "protecting the client from disclosing privileged information or from being subject to unjust pressures; helping settle disputes by channeling them through dispassionate experts; rescuing lawyers from a painful conflict between their duty to advance their clients' interests and their duty not to overreach an unprotected opposing party; and providing parties with the rule that most would choose to follow anyway." Leubsdorf, *Communicating with Another Lawyer's Client: The Lawyer's Veto and the Client's Interest,* 127 U.Penn.L.Rev. 683, 686–87 (1979) (footnotes omitted). It is evident, therefore, that DR 7–104(A)(1), both in origin and in scope, is primarily a rule of professional courtesy. If it were more than that, DR 7–104(A)(1) also would have provided protection for unrepresented parties, as does DR 7–104(A)(2), which forbids an attorney from giving legal advice to an unrepresented person whose interests might be adverse to those of the attorney's client.

Although it is now recognized that the Rule applies in the criminal context, *see generally Hammad,* 858 F.2d at 837–38; *Jamil,* 707 F.2d at 645, it was not until more than a half a century after its promulgation that defense attorneys began to urge that the Rule should apply in criminal proceedings and that DR 7–104(A)(1) should be used "to expand a suspect's right to counsel during custodial interrogations." Moore, *Intra–Professional Warfare Between Prosecutors and Defense Attorneys: A Plea for an End to the Current Hostilities,* 53 U.Pitt.L.Rev. 515, 520–21 (1992). Even then, it was not until 1983 that this Court affirmatively stated that the Rule applies in criminal cases. *Jamil,*

707 F.2d at 645. More significantly, perhaps, not only is this our first opportunity to pass on the scope of the Rule as it applies to federal criminal law in the context of a disciplinary proceeding, it is also our first occasion to pass directly on the applicability of the Rule to a defense attorney. *See generally United States v. De Villio,* 983 F.2d 1185 (2d Cir.1993); *United States v. Schwimmer,* 882 F.2d 22 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990); *Hammad,* 858 F.2d at 834; *United States v. Pinto,* 850 F.2d 927 (2d Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *United States v. Foley,* 735 F.2d 45 (2d Cir.1984), *cert. denied,* 469 U.S. 1161, 105 S.Ct. 915, 83 L.Ed.2d 928 (1985); *Jamil,* 707 F.2d at 638; *United States v. Vasquez,* 675 F.2d 16 (2d Cir.1982) (*per curiam*) (all considering the applicability of DR 7–104(A)(1) to federal prosecutors and their agents in the context of a criminal trial). *But see United States v. Dennis,* 843 F.2d 652 (2d Cir.1988) (considering but not deciding whether trial court might have excluded certain testimony because defense attorney may have violated DR 7–104(A)(1) by talking to client's codefendant without codefendant's counsel's permission).

A review of the relatively brief history of DR 7–104(A)(1) in criminal cases in this Circuit reveals that in the context of applying the Rule to federal prosecutors, we have not been asked to examine the precise scope of the terms "adverse interest," "party" or "matter." In *Massiah,* 307 F.2d at 66, it was assumed without deciding that, if DR 7–104(A)(1) applied to criminal investigations, it would not bar post-indictment contacts with represented defendants by investigatory agencies not acting as the prosecutor's alterego. Then in *Vasquez,* 675 F.2d at 16, it was held that "[e]ven assuming [DR 7–104(A)(1) ] to be applicable to a criminal investigation," it did not prohibit pre-indictment conversations between the represented target of a criminal investigation and a government informant. Such a rule "would simply enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations." *Id.* at 17. There was no discussion of how the Rule might be interpreted to be applicable to criminal investiga-

tions. One year later, in *Jamil*, 707 F.2d at 638, DR 7–104(A)(1) was affirmatively applied to criminal cases, but the court once again declined to find a violation of the Rule by a prosecutor in a non-custodial, pre-indictment setting where the agents who recorded the statements were not acting as the "alter ego" of the prosecution. Therefore, there was no need to reach the question whether the Rule would have been violated and, if so, whether suppression would have been appropriate. *Id.* at 646.

In *Foley*, 735 F.2d at 45, this Court had occasion to address the applicability of the Rule to the practice of federal prosecutors in the Southern District interviewing uncounselled, potential defendants just prior to their arraignment. This Court was particularly concerned about ethical impropriety in *Foley* because counsel had been appointed for the defendant just prior to arraignment, and counsel specifically had requested that the prosecutor not interview the defendant. Notwithstanding this request, the prosecutor proceeded to interview the defendant for two hours. Nevertheless, this Court declined to find the practice unlawful. *Id.* at 49.

Four years later in *Dennis*, 843 F.2d at 652, without deciding the issue, this Court considered whether a defense attorney may have violated DR 7–104(A)(1) in facts somewhat similar to the case at bar. In *Dennis*, the defendant's attorney had a conversation with a *former* codefendant, Pilgrim, who continued to be represented by his court-appointed attorney while he testified for the government (the charges against him had been dropped). When the trial court forbade the defense attorney from eliciting the substance of that conversation during his cross-examination of Pilgrim, this Court, in attempting to discern the rationale for the trial court's decision, noted:

> The third basis on which the court may have ruled was the Government's objection, as seconded by Pilgrim's appointed counsel, that Gerace's [Dennis' attorney] communication with his client's codefendant constituted an interference with the codefendant's attorney/client relationship. If Gerace violated ethical standards by communicating with a party he knew was represented by another lawyer [DR 7–104(A)(1) ] ... the sanction ... should be disciplinary action....

*Dennis*, 843 F.2d at 657. This Court did not, however, reach the issue of a DR 7–104(A)(1) violation under those facts.

In *Pinto*, 850 F.2d at 927, decided the same year, the applicability of DR 7–104(A)(1) to a prosecutor's contact with a convicted defendant, Mecolta, whom the defense intended to call as a witness, was considered. Mecolta had been convicted for acts giving rise to the prosecution of Pinto. At the prosecutor's urging, the court assigned counsel for Mecolta to safeguard his Fifth Amendment rights. Although the prosecutor had told Mecolta's attorney that any additional criminal conduct revealed during Mecolta's testimony not covered by his conviction would lead to a new indictment, the prosecutor, without notifying Mecolta's attorney, had her case agents interview Mecolta to determine what his trial testimony might be. Rejecting the prosecutor's argument that Mecolta was "only a witness," the Court noted that, in light of the prosecutor's warning to Mecolta's attorney, "[Mecolta] was also a *potential defendant* who was likely to reveal information that might compromise his fifth amendment rights." *Id.* at 935 (emphasis added). However, this Court went on to hold that "we need not, and do not, find a violation of DR 7–104(A)(1) in this case." *Id.*

It was against this backdrop of precedent that, in *Hammad*, 858 F.2d at 834, this Court considered whether a prosecutor had violated DR 7–104(A)(1) and, if so, whether suppression of the resulting statements was the appropriate remedy. In *Hammad*, a federal prosecutor, through an IRS agent, provided a government informant with a sham grand jury subpoena. The informant showed the subpoena to the target of the government investigation, who was represented by counsel in an unrelated, ongoing civil investigation into medicaid fraud, and induced several conversations about the underlying crimes, all of which were recorded. The resulting indictment was based largely on the recorded conversations. Reversing the trial court's suppression of the recordings, this Court nevertheless found a violation of DR 7–

104(A)(1). Writing for the Court, Judge Kaufman rejected the government's contention that the Rule was inapplicable to criminal investigations, and found unpersuasive an interpretation that would link the Rule's applicability to the time of indictment. The use of a sham grand jury subpoena to elicit statements from a represented defendant prior to indictment was found not to fall within DR 7–104(A)(1)'s "authorized by law" exception:

> In the present case, the prosecutor issued a subpoena for the informant, not to secure his attendance before the grand jury, but to create a pretense that might help the informant elicit admissions from a represented suspect. Though we have no occasion to consider the use of this technique in relation to unrepresented suspects, *see United States v. Martino*, 825 F.2d 754 (3d Cir.1987), we believe that use of the technique under the circumstances of this case contributed to the informant's becoming the alter ego of the prosecutor. Consequently, the informant was engaging in communications proscribed by DR 7–104(A)(1).[1]

> *footnote* [1]. *See also* ABA Standards Relating to the Administration of Criminal Justice, Standard 3–3.1(d) ("It is unprofessional conduct for a prosecutor to secure the attendance of persons for interviews by use of any communication which has the appearance or color of a subpoena or similar judicial process unless the prosecutor is authorized by law to do so.").

858 F.2d at 840 and n. 1.

The court in *Hammad* was very careful, however, to urge restraint in applying the Rule in the pre-indictment context so as not to unduly hamper legitimate law enforcement investigations: "As we see it, under DR 7–104(A)(1), a prosecutor is 'authorized by law' to employ *legitimate investigative techniques* in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." *Id.* at 839 (emphasis added). To ensure that the holding was perfectly clear, the court further stated that whether the Rule had been violated in a particular situation required a case-by-case determination. "[A]bsent the type of misconduct that occurred *in this case*," noncustodial, pre-indictment contacts between

law enforcement and represented persons would continue to fall within the Rule's "authorized by law exception." *Id.* at 840 (emphasis added). Indeed, as we noted in *Schwimmer*, *Hammad* "held that the prosecutor had committed an ethical violation, but limited the holding to the circumstances of that case." *Schwimmer*, 882 F.2d at 29.

It is significant that since *Hammad*, neither this Court nor any reported district court decision considering an alleged violation of DR 7–104(A)(1) has found that the Rule had been violated. *United States v. Thompson*, 35 F.3d 100 (2d Cir.1994) (finding no violation); *De Villio*, 983 F.2d at 1192 (same); *Schwimmer*, 882 F.2d at 29 (conduct fell within "authorized by law" exception); *United States v. Gray*, 825 F.Supp. 63 (D.Vt. 1993) (although Rule did not apply, if it did, conduct was "authorized by law"); *United States v. Santopietro*, 809 F.Supp. 1008 (D.Conn.1992) (conduct was "authorized by law"); *United States v. Harloff*, 807 F.Supp. 270 (W.D.N.Y.1992) (same); *United States v. Buda*, 718 F.Supp. 1094 (W.D.N.Y.1989) (same); *United States v. Chestman*, 704 F.Supp. 451 (S.D.N.Y.1989) (same); *United States v. Galanis*, 685 F.Supp. 901 (S.D.N.Y. 1988) (same).

In attempting to discern a basis for deciding the matter at hand, we note that both before and after *Hammad*, this Court has never explicitly considered whether a potential defendant was a "party" under the Rule. To be sure, Judge Kaufman's opinion in *Hammad* assumed, *a priori*, that there were adverse parties, leaving only the question whether the conduct at issue was "authorized by law." Moreover, since *Hammad* was decided, the focus in prosecutor cases has been on the "authorized by law" exception, which naturally presupposes a violation of the Rule if the exception does not apply. We are now required for the first time to ascertain the scope of the term "party" as applied to a defense attorney's contacts with potential co-defendants of his or her client in a criminal matter, an issue further complicated by the fact that the potential codefendant also was scheduled to testify as a witness in another, ongoing criminal matter in which the client was a defendant.

### C. DR 7–104(A)(1) Applied to Simels' Conduct

In our view, the vague terms of DR 7–104(A)(1) should be construed narrowly in the interests of providing fair notice to those affected by the Rule and ensuring vigorous advocacy not only by defense counsel, but by prosecutors as well. Accordingly, we believe that the Committee's expansive interpretation of "party" cannot stand. Balancing the purposes served by DR 7–104(A)(1) against the overriding concern of a defendant's Sixth Amendment right to the effective assistance of counsel and a lawyer's ethical duty of zealous advocacy, the Committee's ruling threatens to inhibit defense attorneys' efforts to interview witnesses and develop trial strategies. In our view, Harper was a potential witness against Simels' client in the drug conspiracy case and a potential codefendant—albeit in reality a potential witness—in a related, but distinct, criminal matter, the attempted murder of Diggins. Both we find to be an insufficient basis upon which to rest a violation of the Rule.

The threshold question that needs to be addressed is whether the "matter" at issue for DR 7–104(A)(1) purposes is the multi-defendant drug conspiracy case or the charges stemming from the attempted murder of Diggins for which Harper stood charged and for which Brooks Davis faced identical charges. If the "matter" is the drug conspiracy case, the issue would be a relatively simple one, for it is quite obvious that Harper was never a "party" in that proceeding; he was always merely a potential government witness. If, however, one views the relevant "matter" to be the attempted murder of Diggins, the argument advanced by Special Counsel, which the Committee accepted,[8] is that Harper and Davis were parties in that matter:

> Given Simels' knowledge that Harper and Brooks Davis were facing the same charges, it would be exalting form over substance to conclude that the mere fact that a single accusatory instrument had not been filed changes the application of the disciplinary rule.

*Simels,* slip op. at 5. This reasoning is unpersuasive for two reasons. First, even had Davis been named as a codefendant in the complaint against Harper, as a practical matter no case could have ever been brought against *both* Harper and Davis. Unless another witness surfaced, the government had no case against Davis on the attempted murder charge without Harper. Harper was a cooperating witness and in name only would have been a possible codefendant or a "party" in that criminal proceeding. Thus, the Committee's position that the Panel was "exalting form over substance," *Simels,* slip op. at 5, does not withstand close scrutiny. Quite the contrary, by merely naming a cooperating witness as a codefendant, the government could cut off a defendant's ability to contact a represented "codefendant" even though that person would not likely be a "codefendant" at trial. Harper was a potential witness against Davis in the attempted murder matter and, only nominally, a codefendant or "party." Second, the Committee's reasoning presupposed a critical legal conclusion—that actual codefendants are "parties" for purposes of the Rule. But that issue is not presented for our resolution, nor has it been decided definitively by this Circuit. Thus, the Committee should not have relied on the Rule's hypothetical application to *actual* codefendants in a case involving only *potential* codefendants.

Moreover, as a matter of policy, the broad and ambiguous interpretation of "party" employed by the Committee threatens to chill all sorts of investigation essential to a defense attorney's preparation for trial. *See generally International Business Machines Corp. v. Edelstein,* 526 F.2d 37, 41 (2d Cir. 1975) ("A lawyer talks to witnesses to ascertain what, if any, information the witness may have relevant to his theory of the case, and to explore the witness' knowledge, memory and opinion—frequently in light of information counsel may have developed from

---

8. Before the Panel, Special Counsel urged an expansive definition of "matter," arguing for a broad transaction test, thereby attempting to make both the drug conspiracy and the attempted murder one "matter" for DR 7–104(A)(1) purposes. In this Court, Special Counsel relies on the Committee's interpretation of "matter." Under our analysis, the result would be the same were we to accept Special Counsel's transactional approach.

other sources. This is part of the attorney's so-called work product."), *citing Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Taken to its extreme, the Committee's interpretation of "party" might well bar defense counsel from contacting represented co-targets during the investigative phase of a large conspiracy. *See Niesig,* 559 N.Y.S.2d at 497, 558 N.E.2d at 1034 (cost of broad construction of the term "party" is reduced access to vital information). We are not prepared to hold that a defense attorney engaging in critical pre-trial investigation, which might produce valuable sources of impeachment material or, better, direct evidence of his or her client's innocence, is committing professional misconduct. That attorney is providing the effective defense and the zealous representation required by the Sixth Amendment and DR 7–101, respectively. Finally, those potentially affected by the Rule are entitled to clear notice of its scope; our narrow interpretation provides such notice.

We acknowledge the Committee's concern that an attorney should not be permitted to rely on the evidence-gathering function to procure an uncounselled statement from a witness or potential codefendant that could jeopardize that person's cooperation agreement and be used against him or her at trial. While that concern is not without merit, it raises policy issues that should be resolved against the backdrop of federal law enforcement concerns.[9] If one defense attorney's obligation to provide effective assistance to his client must yield to another defendant's interests, that choice should be made either by Congress or the Supreme Court, and not by district courts' expansive interpretations of disciplinary rules. Until that time, it is incumbent upon defense attorneys to instruct clients in Harper's position not to risk foregoing the benefits of a cooperation agree-

ment by talking to, or by signing statements at the insistence of, another defense attorney. Many defendants are not sophisticated; most, however, are sophisticated enough to understand the risks of jeopardizing a cooperation agreement and potentially subjecting themselves to perjury charges.

In sum, a consistently applied narrow interpretation of DR 7–104(A)(1), which we have adopted here, is a more principled approach. It establishes a clear line which allows both defense attorneys and prosecutors to carry out their respective and necessary roles in our federal criminal justice system without the threat of disciplinary action, leaving to the appropriate policymaking bodies the responsibility to make any needed changes.

## CONCLUSION

The order of the Grievance Committee for the Southern District of New York is reversed, and the censure imposed on Simels is lifted.

---

9. The Third Circuit rejected just such a policy argument in *Baylson,* 975 F.2d at 102. In *Baylson,* the United States Attorneys for the three federal districts in Pennsylvania sued to block enforcement of an ethics rule which the Supreme Court of Pennsylvania had adopted, and which had become applicable to federal prosecutors litigating in those districts through a rule similar to General Rule 4(f). After finding that the adoption of the state ethics rule exceeded the district courts' rulemaking authority, the Third Circuit held that enforcement of the rule as state law

would violate the Supremacy Clause of the United States Constitution. It reasoned that the state's argument that the rule was necessary to safeguard a defendant's Sixth Amendment right to counsel, "while phrased in constitutional terms, is, at least on the facts of this case, an argument of public policy regarding the attorney-client relationship." *Id.* at 106; *see also Almond,* 852 F.Supp. at 87 (confronting the same issue that arose in *Baylson* and similarly rejecting state's policy-based arguments in favor of the rule).