In the Matter of Christopher CHAN A
Member of the Bar of this Court.

No. M–2–238.

United States District Court,
S.D. New York.

June 19, 2003.

N/A, for plaintiff.

Richard M. Maltz, Esq., for defendant.

---

**1.** The Hon. Jed S. Rakoff, Chair of the Committee, has recused himself from this matter,

**DECISION AND ORDER
OF CENSURE**

MCMAHON, District Judge.

On February 25, 2003, Christopher Chan, a member of the Bar of this Court, was ordered to show cause why he should not be disciplined by the Grievance Committee of this Court for violating DR 1–102(A)(5) and DR 7–104(A)(1). Chan, represented by Richard M. Maltz, Esq., filed his initial response with the Committee on March 17, 2003, and supplemented his response on April 10, 2003. For the reasons set forth below, the Committee unanimously[1] concludes that Chan should be CENSURED.

Chan is a criminal defense lawyer. He represented Marzell Underwood in a multi-defendant drug conspiracy prosecution captioned *United States of America v. Marzell Underwood,* S3 02 Cr. 413(JSR). All of Underwood's co-defendants pled guilty. Underwood denied his guilt and went to trial.

One of Underwood's co-defendants was a Wayne Davis. Davis was represented by Marilyn Reader, Esq. Both Davis and Underwood were incarcerated in the Westchester County Correctional Facility (WCCF). Chan knew that Davis had pleaded guilty, and had allocuted that he was part of a conspiracy with Underwood. (1/15/03 Tr. at 9)

While Chan was preparing for trial, Underwood insisted that Chan speak with Davis, whom Underwood claimed had information relevant to his (Underwood's) defense. DR 7–104 provides:

A. During the course of his representation of a client a lawyer shall not:

1. Communicate or cause another to communicate on the subject of the rep-

because the alleged misconduct occurred in a matter pending before him.

resentation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Yet Chan agreed to and did in fact meet with Davis and Underwood together at WCCF. Chan did not contact Reader prior to attending this meeting.

At the meeting, Davis allegedly made statements that Chan felt would assist in Underwood's defense. Accordingly to Chan, Davis agreed at the meeting to testify on Underwood's behalf. Chan placed Davis's name on his witness list and forwarded it to the Government. The Assistant United States Attorney immediately contacted Reader. Reader, who knew nothing of Chan's contact with her client, in turn called Chan, who confessed to having spoken to her client without her knowledge. Judge Rakoff was then notified.

On January 15, 2003, at Chan's next court appearance, he admitted to Judge Rakoff, "I will tell you right now I'm guilty." (Tr. at 5) Chan assigned his behavior to a lapse in judgment resulting from his zeal to assist his client. He has admitted to the Committee, as he readily admitted to Judge Rakoff, that he was in the wrong, although he represented (apparently in mitigation) that Davis had expressed dissatisfaction with Reader's representation and had indicated that he planned to obtain a new attorney.

Thereafter, Underwood was tried and convicted. Also, Davis obtained new counsel, and he reaffirmed his guilty plea. Judge Rakoff referred Chan to this Committee.

■ Chan's counsel urges the Committee not to impose discipline, because Chan was motivated solely by a desire to represent his client zealously; because Underwood, not Chan, initiated the contact with Davis; because Davis expressed dissatisfaction with his attorney; and because neither Davis nor Underwood suffered any prejudice from his unauthorized interview, Counsel also argues that the Second Circuit's opinion in *Grievance Committee for the Southern District of New York v. Simels*, 48 F.3d 640 (2d Cir.1995)—a case he describes as being distinguishable but similar to Chan's—counsels against disciplining his client.

A brief discussion of *Simels* is warranted, because that case is indeed similar to this one. Nevertheless, as that discussion will show, this case and *Simels* are different in one crucial respect.

Attorney Simels represented Brooks Davis, a defendant in a drug conspiracy case.[2] Another individual named Aaron Harper was charged in a separate criminal complaint with attempted murder; the victim was a government witness who had been scheduled to testify at Brooks Davis's trial. Harper agreed to cooperate with the Government and implicated Brooks Davis in the attempted murder.

After Harper agreed to cooperate, but before the Government revealed his name to the defense, Brooks Davis, who was incarcerated in the Manhattan Correctional Center ("MCC"), encountered Harper at the MCC and had some conversation with him. Thereafter, Brooks Davis called Simels and asked the attorney to interview Harper, asserting that Harper had information relevant to Davis's defense. Simels came to the MCC and interviewed Harper. Harper apparently disavowed the statements he had made to the Government. Simels prepared an affidavit to that effect, which Harper signed. Simels knew Harper to be represented because

---

**2.** Interestingly, one of Brooks Davis's co-defendants in that case was an individual named Wayne Davis. The Committee is unaware of any connection between that Wayne Davis and the Wayne Davis whom Chan interviewed at Underwood's behest.

Harper told him as much. Nonetheless, Simels never contacted Harper's attorney.

When Harper testified at the drug conspiracy trial, Brooks Davis's co-defendants stated that they would call Simels as a witness in order to counter Harper's testimony. This led to Simels's disqualification as counsel for Brooks Davis and the declaration of a mistrial.

At the time of these events, Harper was not charged in Brooks Davis's drug conspiracy indictment, and Davis was not mentioned in the complaint against Harper—although the Government had announced (in connection with a motion for an anonymous jury) that it intended to file an attempted murder complaint against Brooks Davis and his co-defendants.

This Committee voted to censure Simels for violating the rule against contacting a represented party. The Second Circuit reversed. It held that this Committee had erred in interpreting the terms "party" and "matter" to include all persons who were involved in the investigation into the attempted murder. However, the Court of Appeals declined to rule more broadly. In particular, the panel stated that it was not presented with, and thus did not address, the question of whether "actual codefendants" in a criminal proceeding were "parties" within the meaning of the Disciplinary Rule. *Id.* at 650.

As Chan's counsel noted in his discussion of *Simels*, this case presents the issue the Second Circuit did not decide in *Simels*. After due consideration, we conclude that *Simels* does not bar the imposition of discipline in Chan's case.

The holding of *Simels* is based squarely on the language of DR 7–104, specifically the phrase "a party he knows to be represented by a lawyer in that matter." According to the Second Circuit, attorney Simels's conduct did not violate the Rule

because he did not communicate with a "party" whom he knew to be represented by a lawyer "in that matter." In Simels's case that was literally true. Harper and Davis were both parties to proceedings brought by some other party (the Government) in a court of law, but they were parties in two wholly separate proceedings. It is thus easy to conclude that they were not separately represented parties "in that matter" (a phrase that, fairly read means "in the same matter"). They were at most potential parties to the same matter. DR 7–104(A)(1) does not, by its terms, apply to potential parties.

■ Our conclusion that *Simels* does not insulate Chan from discipline is equally grounded in the language of the rule. The term "party" means "[o]ne by or against whom a lawsuit is brought," Black's Law Dictionary 1144 (7th ed.1999); and a lawsuit is defined as "[a]ny *proceeding* by a party or parties against another in a court of law." *Id.* at 1148 (defining "suit")(emphasis added). Underwood and Davis are separately represented co-defendants named in the same criminal proceeding. They are, literally, parties (persons by or against whom a proceeding is brought) to the same matter (the same proceeding in a court of law). Unless there is some way to read the word "party" so it does not apply to co-defendants in a criminal (as opposed to a civil) matter, we view this conclusion as inescapable.

■ It is beyond dispute—indeed, the *Simels* court itself recognized—that DR 7–104(A)(1) applies to criminal as well as civil actions. *United States v. Jamil,* 707 F.2d 638, 645 (2d Cir.1983); *see also United States v. Hammad,* 858 F.2d 834, 838–39 (2d Cir.1988) ("This circuit conclusively established the applicability of DR 7–104(A)(1) to criminal prosecutions in [*Jamil* ].").[3] We understand that *Jamil* and all

**3.** In addition, Congress passed a statute in    1998 that was intended, in part, to ensure

other pre-*Simels* cases applied the Rule exclusively to the conduct of federal prosecutors and their agents. However, the implicit basis of those holdings is that the prosecutor and the defendant are parties to the same matter. If they were not, then DR 7–104(A)(1) would not by its terms apply to the Government. It contorts the meaning of the word "party" beyond recognition to say that the Government is a party to a criminal proceeding for purposes of DR 7–104(A)(1) but a co-defendant is not. The Rule is not limited to a "party opponent," or a party whose name appears on the other side of the word "versus" in the caption.[4]

Moreover, the Second Circuit has not always defined the words "party" and "matter" in DR 7–104(A)(1) as narrowly as the panel did in *Simels*. For example, in *United States v. Hammad*, 858 F.2d 834 (2d Cir.1988), the Second Circuit held that DR 7–104(A)(1) applies to prosecutors during pre-indictment criminal investigations. The target of a grand jury investigation is no more a "party" to a "proceeding" than Harper was a party to Brooks Davis's proceeding in *Simels*.

Of course, *Simels* says *Hammad* has to be read narrowly (although *Hammad* gave a broad reading to the literal language of the rule). And the *Simels* opinion quite

properly notes that zealous representation of a defendant in a criminal case is a matter of constitutional dimension, which warrants giving a criminal defense lawyer the broadest possible range of pre-trial investigation. The Second Circuit thus concluded that the applicability of the anti-contact rule—a rule of ethics, not law, that had its origins primarily as a rule of professional courtesy—ought to be considered in light of those policy considerations. *Simels*, 48 F.3d at 645. Taken together, these statements in *Simels* strongly counsel that we apply the rule only to matters that fall literally within its scope.

However, the *Simels* Court of Appeals did not hold that the rule ought never apply to criminal defense counsel who are investigating their clients' cases. And the Circuit did not consider, let alone conclude, whether there might be cogent policy reasons to apply the rule to defense lawyers' contacts with separately represented co-defendants during criminal trial preparation.

Applying the Rule to counsel for criminal co-defendants serves several salutary purposes. For example, a bar against a lawyer's contacting a represented co-defendant without first notifying his counsel affords the defendant in Davis's position a bulwark against intimidation. While noth-

that federal prosecutors were subject to states' no-contact rules. *See* 28 U.S.C. § 530B (referred to as the "McDade Amendment"). Significantly, Congress passed the statute at least partly because of Department of Justice's efforts to exempt its attorney's from the Second Circuit's decision in *Hammad*. *See* Note, *Federal Prosecutors, State Ethics Regulations, and the McDade Amendment*, 113 Harv. L.Rev.2080, 2085–88 (2000) (explaining the events that preceded Congress's enactment of the statute). The McDade Amendment has invoked criticism and praise. *Compare* Larry D. Thompson, *McDade Law is Good for the Profession*, Champion, Apr. 2001, at 22 *with* Note, 113 Harv. L.Rev.2080 (2000).

4. In *Simels*, the court noted that DR 7–104, in contrast to ABA Model Rule 4.2, contained an "adverse interest" requirement because the Rule was entitled "Communicating with One of Adverse Interest." 48 F.3d at 646 n. 7. The adverse interest aspect of that title appears to have changed since *Simels;* the rule is now entitled, "Communicating with Represented and Unrepresented Persons." *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.35 (2003). Regardless, a party need not be a "party opponent" to have an adverse interest. Indeed, co-defendants often (perhaps more often than not) have adverse interests.

ing in this record suggests that Chan was a party to any effort to intimidate Davis, defense lawyers always have to be alert to the risk that their clients will put pressure on co-defendants to testify falsely. It goes without saying that the procurement of perjurious testimony is not a legitimate part of a zealous defense lawyer's unfettered pre-trial investigation. Particularly where co-defendants are incarcerated together, the risk that witnesses will be intimidated or influenced is always present. Underwood was charged with, and eventually convicted of, being the head of a criminal organization of which Davis was a member. Under these circumstances, the claim that the lawyer should be exempted from the Rule because his client, rather than he, initiated the contact, or that the co-defendant appeared willing to speak to the lawyer, is at best naive.

Additionally, while *some* criminal defendants may possess a level of sophistication about what is and what is not in their best interest, we see no reason to assume that *all* criminal defendants are aware of the risks involved in speaking with a co-defendant's lawyer, or in giving statements to parties who do not represent them and who may have interests that conflict with theirs. There is nothing in the record before this Committee to suggest that Davis was particularly sophisticated or knowledgeable about such matters. And even a defendant's awareness of the consequences of perjury does not protect him "from the danger of being tricked into giving his case away by opposing counsel's artfully crafted questions"—a danger the Second Circuit first recognized over forty years ago. *See United States v. Massiah,* 307 F.2d 62, 66 (2d Cir.1962), *rev'd on*

*other grounds,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *see also United States v. Jamil,* 707 F.2d 638, 646 (2d Cir.1983). For example, a defendant may not realize that providing false exculpatory information to a friend's lawyer may seriously compromise his own counsel's efforts to negotiate a favorable disposition of his case. In the context of harsh mandatory penalties in narcotics cases, which can only be avoided by cooperation with the authorities, no competent defense lawyer would advise her client to meet, outside the presence of counsel, with a lawyer representing a co-defendant whose interests are potentially adverse—precisely because the client's unguarded comments in such a situation could redound seriously to his disadvantage.

There are, therefore, sound policy reasons to apply DR 7–104(A)(1) when, by its literal terms, it should apply. Chan's case, we believe, falls within the literal terms of the Rule. Given the facts we confront, we cannot explain how we could refuse to apply DR 7–104(A)(1) to Chan's conduct, consistent with its text—short of concluding that the rule's application to criminal defense lawyers is unconstitutional, which we are loath to do.[5]

Finally, we note that the narrow reading of the rule represented by *Simels* has not met with widespread approval in the profession. We are aware of no jurisdiction that has moved to exclude communications by a defense lawyer with a co-defendant from the scope of DR 7–104. Far from further narrowing the rule, commentators and ethics authorities appear to reject even the narrow holding of *Simels* itself. According to the Restatement (Third) of

---

5. We recognize that the distinguished three member Panel appointed by Judge Griesa to make recommendations to this Committee in connection with the Attorney Simels matter concluded that DR 7–104 "does not bar an attorney from communicating ... with his client's codefendant, even though the one to be interviewed is represented by counsel." *Simels,* 48 F.3d at 644. This Committee respectfully disagrees with the panel's conclusion.

the Law Governing Lawyers, "Both the ABA Model Code of Professional Responsibility (1969) and the pre–1995 version of the ABA Model Rules of Professional Conduct (1983) refer to a 'party' represented by a lawyer, but commentators have uniformly read the prohibition as if the rules said 'person,'" Restatement (Third) of the Law Governing Lawyers § 99 cmt. c (citing 1 G. Hazard & Hodes, *The Law of Lawyering* § 4.2:105, at 733–34 (2d ed.1990) and C. Wolfram, *Modern Legal Ethics* 611 n. 33 (1986)). The Restatement goes on to note: "The Comment to the ABA Model Rules of Professional Conduct (1983) made the point clear. Id. Rule 4.2, Comment ¶ [3] ('This rule applies to communications with any person, whether or not a party to a formal adjudicative proceeding, contract or negotiation, who is represented by counsel concerning the matter to which the communication relates.')." *Id.* The Restatement drafters were aware of *Simels*, specifically citing it as a "but see." In 1995, moreover, the ABA modified Model Rule 4.2 to prohibit a lawyer from communicating with a "person," rather than a "party" known to be represented, apparently to make clear its disapproval of cases like *Simels.* Of course, our text continues to read "party," and we are bound by the Court of Appeals' interpretation of that text in *Simels.* But the reaction of the commentators confirms our reluctance to interpret *Simels,* in the face of its own concern for the literal language of the disciplinary rule, as a broad policy pronouncement that somehow authorizes conduct explicitly prohibited by the rule.

There remains the matter of what discipline is appropriate. In *Simels,* the Committee imposed censure, Given the similarities between the two cases and Chan's sincere remorse, we do not believe it appropriate to impose a harsher punishment. But given our belief that the anti-contact rule is critically important in a co-defen-dant situation, we feel we can impose nothing less.

Accordingly, Respondent Christopher Chan, Esq., is CENSURED by this Committee for his violation of DR 7–104(A)(1).