OPINION OF THE COURT
Barbara F. Newman, J.
Defendants are charged with one count of grand larceny in the second degree under section 155.40 (1) of Penal Law and 13 counts of offering a false instrument for filing under section 175.35 of Penal Law, in connection with an alleged scheme related to Medicaid claims.[1] In the instant application defendants move for an order: (1) finding that the special assistant attorney general assigned to the trial of this case violated Code of Professional Responsibility DR 7-104 (a) (1) (22 NYCRR 1200.35 [a] [1]) and, as a sanction for the trial assistant’s allegedly unethical conduct, (2) disqualifying the trial assistant from any further participation in this case, and (3) suppressing some of the trial testimony of a certain witness.[2] The People oppose.
Defendants’ motion is denied in its entirety.
Procedural and Factual Background
The People allege that between January 1998 and February 2002, Kabir, a pharmacist, acting both individually and as an agent of defendant, Bathgate Prescription Center, Inc., a pharmacy, submitted a number of claims for prescription refills for various Medicaid recipients, which refills had not been authorized by the prescribing physicians. On January 12, 2005, W1 appeared before the grand jury, which returned the instant indictment, at which appearance she was represented by an attorney, Scott B. Tulman, Esq., and testified under transactional immunity. It is undisputed that the People were aware that Tulman has continuously represented W1 in connection with this matter from April 2003 to the present. It is also undisputed that Tulman had informed Special Assistant Attorney General Robert J. Goldstein of the Medicaid Fraud Control Unit of the New York State Office of the Attorney General, who is in charge of this prosecution, that W1 “did not want to cooperate with his *922 investigation and did not want to appear as a witness either in the grand jury, or at any trial of this matter.” (Tulman affidavit at 1.)
In July 2006, this court set a proposed trial date of September 6, 2006, with the understanding that if pretrial discovery had not been completed by that time the trial date would be adjourned. On August 28, 2006, a female investigator for the Medicaid Fraud Control Unit appeared at Wl’s place of employment and informed her that Goldstein, with whom W1 met before being questioned by him before the grand jury, “wanted to meet with [her].” (W1 affidavit at 2.) W1 alleges that the investigator “provided me with [Goldstein’s] telephone number and told me that it was important that I call him that day to set up a meeting with him.” (Id.) W1 called as requested and agreed to meet with Goldstein at his office on August 30, 2006.
On August 30, 2006, the investigator appeared at Wl’s place of employment and transported her to Goldstein’s office, where she was directed to a room in which Goldstein, another man and a woman were present. W1 alleges that she was asked to review her grand jury testimony for accuracy and “they asked me about an affidavit that I had signed many years ago, had me review papers, and asked me my opinion as to whose handwriting was on them.” (Id.) Though the People have made no allegations in response to the instant motion as to what W1 said at the August 30th meeting and Wl’s affidavit contains no allegations as to what the papers she reviewed consisted of or the identity of the person whose handwriting appeared thereon, defendants’ arguments include the implicit and not unreasonable assumption that the papers which W1 was asked to review were prescriptions and that she opined that the handwriting on those prescriptions was Kabir’s.[3]
W1 alleges that the following conversation took place during the meeting:
“I was concerned about reviewing documents without my attorney being present and said ‘Should *923 I call my lawyer. Am I in trouble?’ One of the people in the room said ‘Do you still have a lawyer?’ and I said T do.’ Someone then said ‘You can if you want, but you don’t have to because you don’t need a lawyer.’ The gentleman explained to me that a lawyer was no longer necessary because I already had immunity and I was not in trouble.” (Id.)
The meeting lasted approximately two hours, just prior to the conclusion of which W1 “was given another subpoena to testify on September 19, 2006.” (Id.) W1 does not allege that she made an attempt to contact Tulman at any time from the point that the female investigator spoke with her on August 28, 2006, until after the meeting ended on August 30, 2006. Nor do the People allege that anyone from the Attorney General’s office made an attempt to contact Tulman before the investigator spoke with W1 on August 28, 2006, or at any time thereafter.
Discussion
On the instant motion, defendants argue that by communicating and causing his investigator to communicate with W1 without the prior consent of Tulman, Wl’s attorney, Goldstein violated DR 7-104 (a) (1). Defendants contend that the only appropriate remedies for Goldstein’s allegedly unethical conduct is to disqualify him from any further participation in this case and to suppress the trial testimony of W1 to the extent that such testimony concerns what W1 said during her meeting with Gold-stein on August 30, 2006.[4] In opposition, the People argue that no violation of DR 7-104 (a) (1) occurred inasmuch as that disciplinary rule does not prohibit a prosecutor from communicating with a witness who is neither a party or a defendant in nor a target of the proceeding which is the subject of the communication, whether or not the witness is represented by an attorney. The People also contend that even assuming that Goldstein violated DR 7-104 (a) (1), suppression of Wl’s trial testimony is not an available remedy. Since the court finds that Goldstein’s actions did not constitute a violation of the disciplinary rules, defendants’ motion is denied in all respects and the court will not address the question of what, if any, sanctions or remedies would be appropriate had there been a violation.
*924 Unlike the constitutional rights to counsel and against self-incrimination, DR 7-104 (a) (1) does not include among its ancillary effects a shield against unwelcome communications from a defense attorney or prosecutor concerning a criminal proceeding as to which one is merely a witness. Rather, “DR 7-104(A)(l),[5] both in origin and in scope, is primarily a rule of professional courtesy.” (Grievance Comm. for S. Dist. of N.Y. v Simels, 48 F3d 640, 647 [2d Cir 1995].) “[T]he purpose of the disciplinary rules ... is the regulation of attorney conduct, rather than the protection of individual rights.” (United States v Scozzafava, 833 F Supp 203, 210 [WD NY 1993].) In the context of criminal prosecutions, an additional “purpose of DR 7-104(A)(l) is to protect a defendant from the danger of being ‘tricked’ into giving his case away by opposing counsel’s artfully crafted questions.” (United States v Jamil, 707 F2d 638, 646 [2d Cir 1983]; see also Schwartz, Prosecutorial Investigations and DR 7-104(A)(l), 89 Colum L Rev 940, 942 [1989] [“the Rule was designed principally to address any imbalance in knowledge and skill between the lawyer and the adverse party”].) But the rule does not extend the same protection to one who is neither a defendant nor has any other personal justiciable stake — i.e., the possibility of being found guilty of and/or punished for the commission of a criminal act — in the outcome of the criminal proceeding which is the subject of the attorney’s inquiry.
Specifically, the text of DR 7-104 sets out the parameters governing contact only between an attorney and a “party.”[6] Since the disciplinary rules are intended to govern the conduct of attorneys, it must be assumed that, unless otherwise indicated in the text, the drafters of the disciplinary rules chose *925 the terms that they used in light of the plain and commonly understood meaning of those terms in the legal profession. With respect to the practice of law, the term party means “[o]ne of the opposing litigants in a judicial proceeding.”[7] (Ballentine’s Law Dictionary 919 [3d ed 1969]; see also defendants’ reply memorandum at 5 n 1 [“the term ‘party’ means ‘one by or against whom a lawsuit is brought,’ ” quoting Black’s Law Dictionary 1144 (7th ed 1999)].) Thus, given its plain and commonly understood meaning, the term party does not include a witness to an event which is the subject of a judicial proceeding unless such witness is also one of those by or against whom the same judicial proceeding was brought. (See, e.g., Daniels v City of New York, 138 F Supp 2d 562, 564-565 [SD NY 2001] [in class action lawsuit, “upon decertification (of the class) . . . the status of potential class members would revert to non-party witnesses. As such, the City would be able to interview these witnesses without violating its ethical obligations”]; United States v Santiago-Lugo, 162 FRD 11, 13 [D Puerto Rico 1995] [“a cooperating witness who may be a possible codefendant or a party in a criminal proceeding is not a ‘party’ for purposes of Model Rule 4.2,” which is the equivalent of DR 7-104 (a) (1) (emphasis supplied)].) Moreover, had the drafters meant to proscribe attorney contact with any persons represented by counsel or to include witnesses in such proscriptions, they would have said so. In fact, the parameters governing contact between an attorney and a witness are specifically delineated elsewhere in the disciplinary rules, and include no proscription based upon whether or not the witness has legal representation. (See DR 7-109 [22 NYCRR 1200.40] [entitled “Contact with witnesses”].)
*924 “(a) During the course of the representation of a client a lawyer shall not:
“(1) Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.”
*925 Therefore, DR 7-104 (a) (1) does not prohibit an attorney from communicating on the subject of a criminal proceeding, which he is engaged in the defense or prosecution of, with a witness who is not a suspect, defendant or potential defendant in that proceeding whom he knows to be represented by counsel. (See Grievance Comm. for S. Dist. of N.Y. v Simels, 48 F3d at *926 645 [defense counsel’s interview of a potential witness who was also “a potential codefendant of his client in a related but distinct matter,” without the consent of the witness’s attorney, did not violate DR 7-104 (a) (1)]; People v Weiss, 176 Misc 2d 496, 500-502 [Sup Ct, NY County 1998] [prosecutor did not violate DR 7-104 where witness was “not named in (the) prosecution, nor is it even contended that he is a suspect or target of another investigation”]; cf. In re Chan, 271 F Supp 2d 539, 542 [SD NY 2003] [distinguishing Siméis, the court found that defense counsel’s communication with a “separately represented co-defendant() named in the same criminal proceeding” did violate DR 7-104].) Since W1 was neither a suspect, potential defendant nor codefendant in the instant criminal proceeding when Goldstein caused his investigator to contact her on August 28, 2006, and spoke with her on August 30, 2006, on the subject of the instant criminal proceeding,[8] his failure to seek Tulman’s consent before doing so did not violate DR 7-104 (a) (1).
Defendants’ reliance upon People v Doe (98 Misc 2d 805 [Nassau County Ct 1979]) — the only judicial authority which defendants cite in support of their argument that DR 7-104 prohibits a prosecutor from communicating with a witness who is not a suspect, defendant or potential defendant in the same criminal proceeding, in which the court actually offers an opinion on this specific issue[9] —is sorely misplaced. In Doe, the District Attorney of Nassau County sought an order “enjoining a particular attorney from representing certain witnesses called to appear before a Nassau County Grand Jury.” (98 Misc 2d at 806.) The basis for the District Attorney’s application was that the fact that the attorney had been retained by the witnesses’ employer, which corporation was the subject of the grand jury *927 investigation, posed a potentially irreconcilable conflict of interest for the attorney. (Id. at 808-809.) After finding that there was no reason to disqualify the attorney from representing the witnesses and thus denying the District Attorney’s application, and despite that the court had not reviewed the minutes of the grand jury proceedings (see id. at 812), the court ruminated:
“It further appears that the Assistant District Attorney may have asked the witnesses whether they would speak directly with him, notwithstanding counsel’s refusal to permit interviews outside of the presence of the Grand Jury. Such interference with the attorney-client relationship may itself constitute a breach of [DR 7-104].” (Id. [emphasis supplied].)
Such dictum, based as it was on an admittedly insubstantial record and purportedly addressing an issue which had not been raised or briefed by the parties, is hardly persuasive.
Equally unpersuasive is defendants’ contention that Wl was an “adverse party” within the rule’s ambit of protection because the process of reviewing with Goldstein the testimony which she had given before the grand jury, “presented the very real possibility that she would recant portions of that testimony under pressure from the prosecutor and, thus, subject herself to a perjury charge.” (Reply mem at 8.) It is not unreasonable to say that the possibility that a witness may recant portions of previously sworn testimony while reviewing it is always “very real,” and it is also possible that a witness who does recant her prior sworn testimony may be subject to a perjury charge. However, it does not follow therefrom that every witness is entitled to have an attorney, even one already retained by the time the prior sworn testimony was given, present before she can be asked to review the prior testimony. Unless the prosecutor’s purpose in reviewing the prior testimony is to pursue a potential perjury charge against her — in other words, if the witness is a target of a perjury investigation — the witness is neither a party, nor is her interest adverse to the prosecutor’s, within the meaning of DR 7-104 (a) (1). Since there was no perjury charge pending against Wl, and no indication that such a charge was ever contemplated by the People, Goldstein’s not seeking Tulman’s consent before contacting Wl and reviewing her grand jury testimony on the subject of the instant criminal proceeding in Tulman’s absence did not violate that disciplinary rule.
*928 Accordingly, for all of the foregoing reasons, because Special Assistant Attorney General Goldstein did not violate DR 7-104 (a) (1), defendants’ motion to find that he did so, to disqualify him from participating in the prosecution of this case and to suppress portions of Wl’s trial testimony is denied in its entirety.

. Three of the original 16 counts of offering a false instrument for filing were dismissed by decision and order of the Honorable Phylis Skloot Bamberger, dated June 20, 2005.

. As the identity of the witness is immaterial to the court’s determination of the instant motion and it is not alleged that the witness is suspected of any wrongdoing in the transactions which are charged in the indictment or any impropriety in connection with the events described in the motion, the witness will be referred to hereinafter as “Wl.”

. During her appearance before the grand jury W1 had not been asked to give her opinion as to whose handwriting appeared on any prescriptions. However, while reexamining materials, including prescriptions, which the People had disclosed to defendants during the discovery process, and which reexamination was undertaken at the request of defense counsel, the People allegedly discovered that some of the prescriptions they reexamined were not written by the doctor whose signature they bore. Then, after August 30, 2006, the People advised the court and defendants that they intended to prove at trial that Kabir forged those prescriptions.

. During oral argument on the instant motion, defense counsel made clear that defendants do not seek to preclude the People from calling W1 as a witness at trial nor to suppress her testimony beyond what she said during the meeting.

. This disciplinary rule is codified in section 1200.35 of article 22 of NYCRR as DR 7-104 (a) (1), and cited by many of the authorities quoted herein as DR 7-104 (A) (1). Both cites refer to the same rule.

. Commonly referred to as a “no-contact rule” (see, e.g., United States v Thompson, 35 F3d 100, 105 n 1 [2d Cir 1994]), DR 7-104 is entitled “Communicating with represented and unrepresented parties” and commands in relevant part:

. It is also instructive that the term witness, “[i]n the usual application of the word in law, [means] one who testifies in a cause or gives evidence before a judicial tribunal. A person summoned by subpoena or otherwise to testify in a case.” (Ballentine’s Law Dictionary 1374-1375 [3d ed 1969].) Unlike a mere witness, a party to a criminal proceeding may not be “summoned . . . to testify” in that proceeding. Yet, as W1 alleges, despite her aversion to testifying she has been subpoenaed to do so at the upcoming trial in the instant proceeding (see W1 affidavit at 1, 2), and presumably she will comply with that summons.

. Indeed, at that point W1 could not be prosecuted for any of the crimes charged in the instant indictment because her testimony before the grand jury conferred transactional immunity on her.

. Defendants also cite United States v Hammad (858 F2d 834 [2d Cir 1988]), In re Chan (supra), People v Skinner (52 NY2d 24 [1980]) and People v Goldfinger (149 Misc 2d 765 [Sup Ct, NY County 1991]). However, in Skinner and Hammad, the New York Court of Appeals and the United States Court of Appeals for the Second Circuit, respectively, were concerned with a prosecutor’s contact with a suspect or target of a criminal investigation, as opposed to a mere witness to the matter under investigation, in the absence of the attorney whom the suspect had retained in connection with that same investigation. Goldfinger involved prosecutorial contact with the target of an investigation, not a mere witness, who had retained counsel in a related civil lawsuit. While in Chan, the subject of the improper contact was a separately represented codefendant in the same criminal proceeding.